Cy Carney Appliance Company, Inc. *v.* True.

5-1028                              295 S. W. 2d 768

Opinion delivered November 12, 1956.

[Rehearing denied December 17, 1956.]

962

*Little & Enfield* and *Pearson & Pearson,* for appellant.

*Vol T. Lindsey,* for appellee.

PAUL WARD, Associate Justice.  On September 29, 1953 appellees' dwelling and the contents thereof were destroyed and a number of shade trees were destroyed or damaged by fire.  Appellees filed a suit against appellant, the Cy Carney Appliance Co., alleging the fire was caused by the negligence of Virgil Blakely, a company employee, in filling a butane gas tank near their home, causing the alleged destruction and damage in the total amount of $13,394.33.  A jury verdict was returned in favor of appellees in the amount sued for, and this appeal follows.

For a reversal, appellant relies on four alleged errors committed by the court during the trial, and also on the ground that the testimony does not show proximate cause of the fire or negligence on the part of appellant or its agent.  We will consider these five assignments of errors in the order they are presented to us.

1.  Appellees' testimony shows that part of personal property consisted of certain articles which they had bought for their two minor children, such as a basketball, a baseball, bat, and glove.  Mr. True, in speaking about an item of $750 for clothing, dresses, coats, hats, suits, and dress material, stated that some of it belonged to the boys.  It is not denied that appellees bought and paid for all such articles.

It is contended by appellant that, since the boys were not made parties to the suit through a guardian or next friend (as provided in Ark. Stats. § 27-823) there could be no recovery for the articles in question. We do not agree with this contention. The parents were in fact the owners of these articles. They possessed all the incidents of ownership — they paid for them, they could have taken them away from the boys, and they could have sold them. While our attention has not been called to any decisions of this court announcing the above view, we do find such decisions from other courts. In *Semple School for Girls* v. *Yielding*, 16 Ala. App. 584, 80 So. 158, it was held that articles given to children by parents for support and maintenance remain the parents' property, though the children may have them in possession and may have a special property in them as to all the world except the parents. In *Dickinson* v. *Winchester*, 58 Mass. 114, 50 Am. Dec. 760, it was held that clothing purchased by a father for a minor son belongs to the father, and he may recover for its loss, unless it appears to have been absolutely given to the son, or unless the son has been emancipated. In Tiffany on Domestic relations— Sec. 140 page 386, it says that what is given to a child by his parents in the way of support and maintenance, and for the purpose of education, as clothing, school books, etc. belongs to the parent, and he may reclaim it, or recover damages for its injury.

2. While Mr. True was being cross-examined as to the value of his personal property he was asked: "Q. I will ask you whether or not you and your wife assessed that personal property in January, 1953 or immediately subsequent thereto?" His answer was: "Yes, Sir." When he was asked for the amount of the assessment, appellee objected and the court sustained the objection. This is assigned as error.

While we agree that this elicited information was, under the circumstances, admissible in evidence, yet we think no prejudice or reversible error appears, because appellant did not show what the answer would have been or what the assessment records would reveal. It

was so held in *Tidwell* v. *Southern Engine and Boiler Works,* 87 Ark. 52, 112 S. W. 152 where the court said: "It is not shown in record what the answers of appellant, as a witness in his own behalf, to the excluded question would have been. Therefore, no prejudice appears in the exclusion." A similar situation was presented in *City of Prescott* v. *Williamson,* 108 Ark. 500, 158 S. W. 770, and was disposed of in these words:

"It is not shown what the answers of any of the witnesses to any of these questions would have been. The appellant nowhere stated what it expected to prove by either of them. Conceding without deciding that the questions were proper, and that the answers thereto would have been competent testimony, we are not able to say that any prejudicial error was committed in refusing to allow the witnesses to answer them since the record does not disclose what their answers would have been."

3. Appellant objects to the rule (applied by the trial court) for the measure of damages as pertaining to *trees* and the *house,* and to Instruction No. 8.

*Trees.* The testimony of appellees was that valuable shade trees were destroyed, and that the market value of the farm, after the fire was $1,000 less than it was immediately before the fire because of said loss. The court instructed the jury that this was the proper measure of damages, and the court was correct. It was expressly so held in *St. Louis, Iron Mountain and Southern Railway Company* v. *Ayres,* 67 Ark. 371, 55 S. W. 159. At page 374 of the Arkansas Reports, this Court stated:

"As to the measure of damages for the destruction of the trees on the land by reason of the fire, we think the fifth instruction by the court announced the proper measure; that is, that the measure was the difference between the value of the land with the trees unburned and with the trees burned. This means the market value of the land. The trees were a part of the freehold, and could not be replaced in a short time, and only at considerable expense. *Coykendall* v. *Denkee,* 13 Hun, 260.

The destruction of the trees was a depreciation in the value of the land of which they were part, and it was competent to show by evidence what the land was worth before the destruction of the trees, and what it was worth after they were destroyed; and, this being shown, the *quantum* of damage was a matter of computation for the jury. 3. Sutherland on Damages, 612; *Coykendall* v. *Denkee,* 13 Hun, 260; *Railway Co.* v. *Combs,* 51 Ark. 324.''

The same rule, as to the destruction of trees, was announced in *Bush, Receiver St. Louis, Iron Mountain and Southern Railway Company* v. *Taylor,* 130 Ark. 522, 197 S. W. 1172; and in the cases cited therein.

*House.* Appellees offered certain testimony, and apparently would have offered more had appellant not objected, to show the construction, size, condition and value of the house before it was destroyed. Appellant says this testimony was inadmissible, but we do not agree for the reasons set out below.

*Instruction No. 8.* In paragraph ''B'' of this instruction the court gave as the measure of damages (for loss of the house) the ''cost to restore the dwelling house to its original condition, that is to say the cost of replacement.'' By ''original condition'' we take it that the court meant the condition it was in immediately before the fire, and will so consider it since no specific objection is made on that point.

Appellant's contention is that the instruction is erroneous, and that the true measure of damages is the difference between the market value of the farm (with the house on it) just before the fire and the market value just after the fire, considering loss of house only. We have given careful consideration to appellant's contention and to many of our decisions relating thereto, and, although there is a lack of a clearly defined distinction regarding the applicable rule in some instances, we cannot say the trial court's instruction here was wrong. In fact it appears to be the approved rule. The opinion in the *Bush* case, *supra,* discusses and defines the difference between the rule for the measure of damages for the loss of trees and for the loss of a house. In substance,

this case holds that if the value of the property destroyed depends upon its connection with the soil (as in the case of shade trees for instance) the measure of damages is the difference in the market value of the land before and after destruction, but, if the property destroyed can be replaced in substantially the same condition it was immediately before destruction, (as in the case of a house) then the measure of damages is the cost of replacement.

The *Bush* opinion was cited and followed in *Missouri Pacific Railroad Company* v. *Wood,* 165 Ark. 240, 263 S. W. 964. We think the rule announced in the *Bush* case is sound, although, as recognized in that opinion, its application may sometimes be difficult. We do not say at this time that the "before and after" rule should never, under any circumstances, apply to the destruction of a house or building, but we do hold it does not apply here under the facts of this case.

4. We do not agree with appellant that appellees' requested instruction No. 7 is in conflict with his own requested instruction No. 7. To understand appellant's objection in this matter it is necessary to briefly set forth these undisputed facts: Appellant's alleged negligence consisted in overfilling the small storage tank; This tank had on it two gauges — one called the "percentage gauge" primarily to show the owner (True) when it needed filling, and the other was called an "outage gauge" which allowed the fluid to run out of a very small tube when the tank was approximately 85% full, and was to be used by the filler of the tank as a matter of safety, and the percentage gauge was out of order at the time the tank was filled on this occasion.

In appellant's instruction the court told the jury appellee had not proven that the failure to repair the percentage gauge was the proximate cause of the fire. In appellees' instruction the court told the jury, in effect, that it could predicate negligence on appellant's act in filling the propane gas tank of the plaintiffs' too full with liquefied petroleum gas, over and above its normal and safe operating capacity. To this instruction, appel-

lant imposed a general objection. It clearly appears to us that the two instructions are not conflicting.

5. *Sufficiency of the evidence.* Finally it is earnestly and ably contended that the judgment of the trial court should be reversed and the cause dismissed because there is no evidence of negligence or proximate cause, but again we cannot agree.

Most of the evidence, except that relating to the cause of the fire, is undisputed.

Appellees lived on a farm in Benton County. Propane gas was used for heating and cooking. The gas was stored in two tanks near the dwelling — one tank had a capacity of 460 gallons and the other 1,000 gallons, each provided with two gauges as before stated. The percentage gauge on the small tank had been out of order for several days or weeks, and Mr. True had made this fact known to Bradley (the agent of appellant) and he said he told Bradley not to put any more gas in the small tank until the percentage gauge had been fixed. On August 28, 1953 (the day before the fire), however, some one (presumably Mrs. True) asked appellant to deliver gas to appellees' home. The next day about 10:00 A. M. Bradley, unlicensed to handle propane gas but an employee of appellant for 2 or 3 years in different capacities, arrived at appellees' home, in the absence of Mr. True, with the gas truck. He first put gas in the small tank and then in the large tank — a total of 542 gallons. Mr. True arrived before the large tank had been filled, and by about 11:30 A. M. Bradley had completed the filling operation.

At about 3:15 that afternoon Mrs. True lighted the oven in the kitchen stove and one burner on top, preparatory to baking a cake. Some 30 or 40 minutes later, while Mrs. True was standing in the kitchen door she saw a flame shoot out of the hole where the oven control had been located and from the top burner. Immediately the kitchen was afire and the whole house and contents were destroyed. It is not denied that normally there is only about 7 ounces of pressure in the feeder lines to the stoves and that such pressure was not suffi-

cient to cause the flames to shoot out in the manner above mentioned. Although the pressure in the storage tanks may be as great as 150 to 200 pounds, the pressure in the feeder lines ordinarily remains at approximately 7 ounces, because each storage tank is equipped with a regulator which reduces the pressure. There was nothing suggested that could have caused the flames to shoot out as they did here except excess pressure in the feeder lines.

It is the theory of appellees that Bradley must have filled the small tank too full, and that this caused the pressure in the feeder lines, while appellant contends that, because of the regulator, overfilling could not cause extra pressure in the feeder lines. The regulator was removed shortly after the fire, and an examination later by a state inspector showed that it was in no way out of order, and this testimony is not contradicted.

On the other hand, it is the contention of appellees that overfilling the tank with propane gas under pressure (as it is always necessarily done) will cause the fluid or gas to come in contact with the regulator in such a way as to, in turn, cause the regulator to "freeze," allowing the gas and pressure to extend into the feeder lines. Several experienced propane gas dealers testified to the above effect. This testimony, we think, constitutes substantial evidence to support the jury's finding.

The testimony on both sides relative to the proper handling of propane gas and as to the efficiency of the regulator to control pressure in the feeder line is voluminous and need not to be set out at length because a short resume will suffice to show that the jury's verdict is sustained by substantial evidence. For appellant, the Chief Technicians for the Boiler Inspection department of the Labor Department of Arkansas testified at great length as a specialist. The substance of his testimony was that the regulator was (when he examined it) in good condition, and that it would protect the pressure in the feeder lines in all events — even if the storage tank was filled completely. On the other hand it appears uncontradicted that safe practice required that the tank

should not be filled to more than about 85% capacity, and further that the purpose of the out gauge was to insure against doing so. On behalf of appellees, the following testimony was introduced: Mr. Chastain, a propane dealer, stated that he examined the small tank after the fire and it was too full, and that when the liquid is too high in the tank it will get into the feeder lines. Mr. Hugh Anderson, experienced in handling propane gas, said a tank could be filled to a point above the out gauge level to where the liquid could pass into the feeder lines, and that if the regulator "freezes" over from whatever cause the liquid and gas will go into the feeder lines and raise the pressure to that of the tank. Mr. Charles Gorum, with eleven years in the propane gas business, testified at great length, corroborating the witnesses previously named. It was up to the jury to believe that overfilling could not possibly cause extra pressure in the feeder lines as indicated by appellant's expert testimony, or to believe that it could as stated by appellees' witnesses.

Affirmed.