SAMSON CONSTRUCTION COMPANY, INC.,
ET AL. *v.* BRUSOWANKIN ET AL.

[No. 69, September Term, 1958.]

(Two Appeals In One Record)

461

*Decided December 24, 1958.*

*Motion for rehearing filed and denied, January 23, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*John J. Ghinger, Jr.,* with whom were *Clarence W. Sharp* and *Weinberg & Green,* on the brief, for Samson Construction Company, Inc., one of the appellants.

*Richard H. James,* for Raymond W. Coffman, individually

and trading as Lincoln Clearing Company, and Lincoln Clearing Company, Inc., the other appellants.

*Donald N. Rothman,* with whom were *Lewis A. Kann, Gordon, Feinblatt & Rothman,* and *Jerome V. Monfred* on the joint brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

Mr. and Mrs. Brusowankin and Mr. and Mrs. Krampf bought three attractively wooded homesites (the Brusowankins two lots, and the Krampfs one), high on a ridge overlooking a valley in a rapidly developing area of northwest Baltimore. Two years later, Samson Construction Company, Inc., bought a twenty-three acre tract that touched the three lots, on which it planned to build houses for sale. It hired Raymond W. Coffman, who traded as Lincoln Clearing Company, Inc., to clear the land. Lincoln proceeded to bulldoze all trees from the Samson land. Unfortunately it also stripped the trees from the lots of the Brusowankins and the Krampfs, so that they, too, with the exception of half of one of the Brusowankin lots, were as bare as a board but not as smooth, being torn and rutted from the uprooting of the trees and the bulldozers.

The Brusowankins and the Krampfs sued Lincoln and Samson, one count alleging trespass and another negligence. Both declarations allege that the plaintiffs had purchased their lots to build their homes, primarily because they were covered abundantly with ornamental and shade trees of beauty, quality and size, and that the trees and their foliage had particular value to them; that the beauty and desirability of the lots as homesites had been destroyed because of the removal of the trees and erosion of the land; and that in order to build, they must, at great expense, replace topsoil, landscape, and build drainage ditches to offset the erosion resulting from changes in grade.

The trial court told the jury, as a matter of law, that Lincoln had trespassed on the land of the lot owners and was liable to them for damages, and submitted to the jury the questions of the negligence of Samson and the amount of

damages. The court refused to instruct, as Lincoln and Samson requested, that the only measure of damage was the difference between the value of the lots before the injury complained of and the value afterwards; and did instruct them, as the lot owners requested, that if the jury found the owners had reasons personal to them for restoring the lots as nearly as reasonably possible to their original condition, the jury could allow the reasonable cost of so doing, even though greater than the value of the lots.

Lincoln concedes it is liable for the destruction of the trees but challenges the measure of damages as to them; it denies liability for causing erosion to the lots by changing their grade in relation to the adjoining Samson land. Samson denies that it was negligent in any way, and joins Lincoln in claiming that the only measure of damage is the difference in value before and after the injury; or, in the alternative, that if the cost of restoration has any place as a measure of damage, it is only if that cost does not exceed the diminution in the market value; if it does exceed the diminution, then the before and after test must apply.

We think there was sufficient evidence from which the jury could find that Samson had been negligent and that its negligence was the proximate cause of the damage to the lot owners. The testimony was that Samson was extremely anxious to get on with the clearing; that it furnished Lincoln with a plat that included property which did not belong to Samson but which was indistinguishable from it physically, and which did not designate the area to be cleared; that Samson failed to have the boundaries of its property staked on the ground, although it assumed the responsibility for so doing; that the bulldozing of the trees on the homesites occurred before the lots were staked; that Samson told Lincoln that it should clear all land in the area except lots already built on or on which there were lawns; that Harry Samson and Norman Samson, the officers and principal stockholders of the corporation, told Lincoln to proceed before the area had been staked; that Harry Samson walked over the property with Coffman, the owner of Lincoln, and walked by the lots in question without even mentioning them, and, in addition,

told Coffman that Samson had options on everything that wasn't built on or planted. There was testimony, admitted over Samson's objection, that Harry and Norman Samson both told Lincoln to begin the clearing without a survey and that Samson would be "responsible" for any damage done to property not owned by it. We think that there was no error in admitting this testimony. It was relevant to show Samson's insistence that clearing begin and its disregard for foreseeable harm to the rights of others.

The cases make it plain that the mere employment of an independent contractor will not always relieve the prinicpal from liability for damage done by the contractor. If the injury that occurs is such as might have been anticipated as a probable consequence of the execution of the work let out to the contractor under the instructions given by the employer, the employer, as well as the contractor, may be held liable. *P., B. & W. R. Co. v. Mitchell,* 107 Md. 600; *Bonaparte v. Wiseman,* 89 Md. 12. In *Levi v. Schwartz,* 201 Md. 575, 583, the trial court instructed the jury that if the contractor "acted under the direction or with the consent of the officers or agents of the developer * * * then the developer and the officers or agents who gave authorization are liable" for the acts of the contractor, and this Court said: "We think that instruction was correct." We have no difficulty in concluding that what occurred as a result of the acts and omissions of Samson should have been foreseen by it and that the jury could find it responsible.

Both Samson and Lincoln contend that there was no evidence of erosion damage to the lots for which they could be held responsible. We think there was. Samson raised the grade of its land to the rear of the lots two and a half feet and, it was testified that, as a result, the lots had eroded and would erode in the future. There was evidence that Lincoln had lowered the grade of the lots some inches by its operations. This lowering, caused by the removal of the trees, plus the use of heavy machinery on the lots, together made Lincoln contribute to past and future erosion. An expert witness said, in speaking of damage done by Lincoln, that when heavy equipment was run over soil from which big

trees had been taken, the water cannot go down into the soil "because it is sealed", and that in such case "You have a lot of layers of soil running in the wrong direction. So, therefore, you won't grow anything and it will wash much more so than an undisturbed soil." He testified that the best way to correct the damage was to cover the lots with a layer of topsoil, plant them with grass and construct a swale between them and the Samson land so that the water could be drained off. A not dissimilar situation was dealt with in *Laird, Rock & Small, Inc. v. Campbell,* 200 Md. 627, 632. In that case the lower court had found that the defendants had stripped the land and made the subsoil so hard that water flowed over it onto the adjoining land of the plaintiff in a stream, but that a great amount of water, in any event, would have flowed onto that land from natural causes and conditions, and exonerated the defendants. Judge Markell, for the Court in reversing, held that a wrongdoer may not apportion or qualify his own wrong, and said: "Whether additional water due to defendant's negligence contributed 'materially' to the damage is not a question of percentage. * * * The reasonable inference is that every drop in the cup contributed to the cup overflowing." We think the reasoning and conclusions of that case are applicable to the matter of erosion in the case before us. The instructions to the contrary, requested by the appellants, properly were denied.

We turn to consideration of the proper measure of, and the testimony as to, damages. It is a fundamental principle that one whose real property has been damaged should recover an amount sufficient to compensate him fully for losses which are the proximate result of the wrongdoer's conduct, which he pleads and proves. 15 Am. Jur. *Damages* § 106; 34 Am. Jur. *Logs and Timber* § 131; *Baltimore Belt R. R. Co. v. Sattler,* 102 Md. 595, 601; *The Redemptorists v. Wenig,* 79 Md. 348, 355. The general rules may be summarized as follows. If the real value of trees wrongfully severed is as timber, their value as timber may, if sought, be recovered, and often a statute will—as does Code, 1957, Art. 66C, Sec. 368—provide for double or treble actual value as damages. (Generally such increased damages are treated

as punitive. *Superior Construction Co. v. Elmo,* 204 Md. 1, 14.) Where it is alleged and proved that trees destroyed had a calculable value separate from that of the land on which they stood, many cases have applied the measure of the reasonable value of the trees at the time and place of their destruction. Where the separate value of the trees destroyed is not susceptible of exact proof, or complete compensation cannot be afforded without consideration of the loss in relationship to the land as a whole, based on its previous condition, the courts often have said that a proper measure of damages is the difference in the value of the land before and after the act complained of. Usually, in the latter cases, there is taken into account evidence, otherwise sufficiently definite and probative, as to the value of the trees as bearing on the whole loss, and the amount of the depreciation. *McCormick on Damages,* Sec. 126, p. 491; 25 C. J. S. *Damages* § 85; 161 A. L. R. 549, 551, 598, 601, *et seq.,* and cases cited. The annotator says at page 551 that of the cases holding the "before" and "after" rule proper, "few of them, if any, evince an intention to view the rule as an arbitrary one or an exact formula, exclusively applicable or in itself appropriate to the solution of all problems * * * but rather they show that regard should be had in each case to all the circumstances and the separate items of damage proved * * *." It is to be noted also that exceptions and reservations to the absolute application of the before and after rule have been especially recognized in the case of fruit and shade trees. 15 Am. Jur. *Damages* § 119.

Many cases in many jurisdictions have said that where trees, including fruit and ornamental trees, are destroyed or harmed by a wrongdoer, the proper, or a permissible, measure of damage is the diminution in the value of the land on which they grew. This Court has so stated, usually in cases where that was the damage sought and proved by the owner. See *Western Union Tel. Co. v. Ring,* 102 Md. 677; *Western Md. Ry. Co. v. Jacques,* 129 Md. 400; *Western Union Tel. Co. v. Rasche,* 130 Md. 126. However, the value that is to be determined is not invariably the market value of the land on which the trees stood before and after the wrong, but under

appropriate circumstances may be the value of the trees or the reasonable cost of a reasonable restoration of the property as it was before the wrong. Restatement, *Torts,* Sec. 929. 4 Sutherland, *A Treatise on the Law of Damages,* 4th ed., Sec. 1019, citing a long list of cases, says: "The plaintiff may adopt the value of the timber or fruit trees as the measure of his damages, but is not obliged to do so; if the injury to the land exceeds the value of the timber or trees or, in other words, if the trees were worth more standing, he may recover their value as part of the lands."

A number of cases have held directly, or in effect, that "An owner of real estate has a right to enjoy it according to his own taste and wishes, and the arrangement of buildings, shade trees, fruit trees, and the like may be very important to him * * * and the modification thereof may be an injury to his convenience and comfort in the use of his premises which fairly ought to be substantially compensated, and yet * * * the disturbance of that arrangement, therefore, might not impair the general market value. * * * The owner of property has a right to hold it for his own use as well as to hold it for sale, and if he has elected the former he should be compensated for an injury wrongfully done him in that respect, although that injury might be unappreciable to one holding the same premises for purposes of sale." *Gilman v. Brown* (Wis.), 91 N. W. 227, 229. Some of the cases that have agreed in their holdings with the language just quoted are listed below.[1]

---

1. *Watson v. Jones* (Fla.), 36 So. 2d 788 (the trees cut were alleged and proved to have had "a peculiar value for ornament and shade" to a *proposed* trailer camp and the damages recoverable were held to be the amount of the injury done to the land in the light of the purpose for which it was bought, not "the difference in market value for any purpose before and after the cutting."); *Eldridge v. Gorman* (Conn.), 60 A. 643 (land held for building purposes with a particular value "caused by the special value of the trees as shade or ornamental trees while standing upon this land" was damaged by the cutting of the trees. The Court said: "Such injury was undoubtedly a legitimate element of damage if properly alleged * * *"); *Hoyt v. Southern New England Tel. Co.* (Conn.), 22 A. 957, 958 (plaintiff recovered and was allowed $150.00 for the

The owners gave testimony supporting the allegations of the declarations that their only purpose in buying and holding the lots was for homesites, and that they bought those particular lots in part because of their high location but, pri-

---

cutting of an ornamental shade tree on an unused lot since the lot was "available and valuable as a site for a high class of buildings." The Court said: "There are, of course, cases where the value of the tree would cover the entire damage. It may have no important relation to the property upon which it is growing, and be of no use except for firewood. But an ornamental shade-tree, upon land available for dwelling-houses, has a very different relation to the land, and may give it a special value."); *City of New Orleans v. Shreveport Oil Co.* (La.), 128 So. 35 (abutting owner cut down a tree growing between curb and sidewalk. It was of such a size it could not be replaced so the cost thereof was not a proper measure of damages; Court awarded damages of $750.00, saying that the cases relied on by the defendant relating to ordinary trespass on land and the cutting of timber in forests were not applicable to the cutting of an ornamental shade tree in the city); *Louisville & Nashville R. Co. v. Beeler* (Ky.), 103 S. W. 300, 302; *Barker v. Publishers' Paper Co.* (N. H.), 103 A. 757, 759 ("In trespass for cutting and carrying away shade trees, the owner is not limited to their value for lumber. * * * He recovers what their aesthetic value was."); *Stephenville, N. & S. T. Ry. Co. v. Baker* (Tex. Civ. App.), 203 S. W. 385, 386 (the trees destroyed were fruit and shade trees in the rear of plaintiff's home. The Court said: "* * * testimony was admissible to show the value of the trees as they stood before they were injured, and the extent of their injury", and held that the amount "necessary to compensate the plaintiff for being deprived of them for the uses intended will come nearer affording actual compensation for the injuries sustained than * * * the value of the land * * * immediately before and immediately after the injury." The Court emphasized that while the general rule may be the "before" and "after" test "* * * that is not an inflexible rule", and added that "In fact, the only inflexible rule as to the measure of actual damages is the rule of compensation."). To a similar effect are: *Nordgren v. Southwestern Bell Tel. Co.* (Kan.), 262 P. 577; *Barker v. Missouri Pac. Ry. Co.* (Kan.), 145 P. 829; *Babcock v. Postal Telegraph-Cable Co.* (S. C.), 109 S. E. 116 (the measure of damage for destroying a grove on hospital grounds was not the value of the timber as such since there must be considered the use to which the grove "should be put"); *Chicago, R. I. & P. Ry. Co. v. Swinney* (Okla.), 159 P. 484; *Laser v. Jones* (Ark.), 172 S. W. 1024; *Montgomery v. Locke* (Cal.), 13 P. 401; *Norfolk & W. R. Co. v. Bohannan* (Va.), 7 S. E. 236.

marily, for the beautiful trees on them. Restatement, *Torts,* Sec. 929, cited above, says that for harm to land from a past invasion recoverable damages include compensation, at the election of the plaintiff, for "the difference between the value of the land before the harm and the value after the harm or the cost of restoration which has been or may be reasonably incurred * * *." Comment *b* points out that if the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass "unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm", and adds that this limitation would be applicable, for example, if a person by trying out explosives "were to create large pits upon the comparatively worthless land." The Restatement goes on to point out in Comment *b* that "On the other hand, where a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building."

In *Superior Construction Co. v. Elmo,* 204 Md. 1, 10, *supra,* Sec. 929 of the Restatement and Comment *b* were set forth and it was then said: "We do not think the Maryland law differs materially from the rule set forth in the Restatement." In *Levi v. Schwartz,* 201 Md. 575, 585, *supra,* the defendants had deprived the plaintiffs of lateral support all around the boundaries of their property, leaving their house on a raised island, so to speak. The plaintiffs' testimony was that the only way to stop the erosion and restore the property was to build a retaining wall around its edges. The trial court instructed the jury, as in the case before us, that they could award the plaintiffs the cost of restoration "even though this may be greater than the entire value of the property." The appellants-defendants complained that the amount of the $11,500 judgment, which was substantially greater than the entire value of the property, was disproportionate, and that the instruction of the lower court was erroneous. This Court said: "We find no reversible error in the instruction in view of the fact that the only way to restore the property is to

build a retaining wall." We think there was no error in the instruction of the court on the applicable measure of damages in the case before us.

There was no real contradiction of the owners' claim that they had reasons personal to them for buying and holding the lots as sites for their homes. Indeed, one of appellants' witnesses gave testimony that substantiated the claim. The most that was done was to say that other building lots in the broad general area could be bought. This is no more than claiming that the wrongdoers could select a homesite for the owners, whether or not they wanted this done. The cases have not held, as appellants suggest, that for the "reasons personal" rule to apply, the injury must be to a home lived in, or the land around it. It would seem to be enough if the land injured is suitable and available for a homesite, and is held for that purpose by the owner.

The lot owners produced a nurseryman of extensive experience over a period of many years, an expert admittedly qualified, who was familiar with the area by reason of having cared for the trees of a property owner across the street from the lots in question for four or five years. From his prior knowledge and the trees that remained on one-half of one of the Brusowankin lots, he reconstructed the number and size of the trees that were on the rest of the lots in question prior to the destruction. He testified that it would cost some $28,000 to replace on the lots trees of the same number, size and quality as those destroyed, but said flatly that this could not possibly be done for a number of reasons, including the fact that the trees of the size destroyed could not be transported through the streets and, if planted, would not live. He then testified that to plant trees that could be transported and planted, similar in number and kind to those that had been destroyed, would cost some $11,000 on the Krampf lot and $16,000 on the Brusowankin lots; but he said that this would not be reasonable ("it is entirely too expensive") and, in effect, that it would not restore the lots as homesites as nearly as practicable for the reason that if houses were to be built on the lots, as contemplated, the trees in the center of the lots would have had to be taken down

in any event. The witness concluded that to restore the lots as homesites within practicable and reasonable limitations the course to follow to repair the bulldozer damage to the land and help prevent erosion, would be to put on a layer of topsoil over gravel and plant grass—"that is the cheapest way to do it." He estimated the cost of this as $1,482 for the Krampf lot and $1,640 for the Brusowankin lots. As to new trees, he recommended planting but six "large" trees—two tulip poplars, six-inch caliber, four oaks of various varieties, five-inch caliber, and two gums, five-inch caliber. He proposed eight small dogwood, four small redbud and six small white birch to replace those destroyed, and that this would be restoring the lots as homesites "economically and sensibly" and would be putting in no "more trees than were necessary, allowing for a space in the middle for the houses, in each case and * * * the largest trees on that list are six-inch caliber instead of the largest that could be moved which are nine." He gave specific details of cost, and the total estimate for his recommended course of restoration, including the swales, the topsoil and the trees, was some $5,200 for the Krampf property and some $7,200 for the Brusowankin property (They were to have proportionately more trees.).

The appellants objected to the admission of the testimony largely, if not wholly, on the ground that it was immaterial and irrelevant on their theory that the only applicable measure of damages was the before and after value. They now argue that the large sums mentioned improperly influenced the verdicts of the jury. The witness made it clear beyond doubt or misunderstanding that the only course of restoration that he, as an expert, recommended as sensible and reasonable would cost the Brusowankins $7,200 and the Krampfs $5,200. The jury gave $4,000 and $2,500, respectively. We think the size of the verdicts shows that the jury were not inflamed or misled by the testimony complained of.

The appellants' exception to the charge was that it did not present the before and after theory of damages to the jury as the sole applicable measure, not that the jury should have been allowed to decide whether that theory or the theory of the owners was applicable. In other words, the appellants

did not except to the charge on the ground that the jury was not told to decide whether the owners (a) did have reasons personal for holding the lots (and so could claim damages in excess of diminution of market value), or (b) did not have such reasons (and, so, could claim only diminution in market value), but excepted only on the ground that diminution in market value was the only applicable measure. Since the appellants did not specifically except to the failure of the charge to present alternative theories of the measure of damages, the point is not to be passed on here. Maryland Rule 554 e.

*Judgments affirmed, with costs.*