Robert WORTHINGTON *v.* Bruce ROBERTS and
Carolyn Roberts

90-119 803 S.W.2d 906

Supreme Court of Arkansas
Opinion delivered February 18, 1991

*Butler, Hicky & Long*, by: *Fletcher Long, Jr.*, for appellant.

*Mooney & Boone*, for appellee.

DAVID NEWBERN, Justice. This is a negligence case in which the main issue is whether the court erred in granting a new trial on the ground that the jury verdict was clearly against the preponderance of the evidence. Ark. R. Civ. P. 59(a)(6). We affirm because the judge did not abuse his limited discretion in granting a new trial. We also address a damages issue which is not necessary to the decision here, but which may arise upon retrial.

The appellant, Robert Worthington, is a pilot who was hired by Earl Watkins to spray a chemical known as STAM on Watkins's rice field. The field is located south and across a road from a four-acre wooded tract upon which the residence of the appellees, Bruce and Carolyn Roberts, is located.

Bruce Anthony Roberts, the son of the appellees, who was living with them, testified that on the morning of June 4, 1984, Watkins came to the Roberts's door and asked if Bruce could help Watkins hold some tarps over the Roberts's tomato plants because a crop duster was about to spray. Bruce testified that he tried to help hold the tarps over the plants but the wind was blowing hard enough to make it difficult. The tarp kept "flying up." He also testified, without objection, that Watkins told him he had not thought the spraying would occur that day because the wind was so bad. The wind was blowing from the southwest, and the chemical burned his eyes. Bruce testified that since that date there have been large quantities of leaves and limbs in their yard which he did not remember being there before.

Bruce's sister, Tracey Roberts, who was also living in the home, said she went into their yard to watch the attempt to cover the tomato plants and heard Mr. Watkins say "he had told the pilot not to fly if the wind was blowing hard." She testified that the wind was blowing hard. She said "You could smell the chemical in the house real bad, and we left the house. A day or two later I broke out in a rash."

Arthur Mullins, an employee of the Federal Aviation Administration, testified that on June 4, 1984, between nine and ten a.m., the wind was blowing from the southwest from six to eight knots. While he did not state a conversion formula, Mullins said

that wind velocity in knots is faster than the same number in miles per hour.

Finis Burns, an employee of the Arkansas State Plant Board, testified that he went to the Roberts property in response to a complaint about the chemical damage to shade and fruit trees and flowers. He observed that they were damaged by chemical drift which caused "a burning effect — browning of the leaves — defoliation." The damage was "moderate to severe."

Appellee Carolyn Roberts testified that they had purchased the land as the location for their house because of the trees. They built the house in the middle of the tract in such a way as to displace as few trees as possible. She recalled June 4, 1984, and the fact that the wind was blowing hard. She also stated that the home smelled of the chemical spray which was so strong that the family spent the night elsewhere. She said the trees lost their leaves and some branches and became ugly.

Appellee Bruce Roberts testified that on the date in question he was working away from home on a construction project involving sheet metal, and the wind was blowing so hard the metal sheets were difficult to handle. When he arrived home and learned of the spraying problem he inspected his trees and found that the leaves were "curling." He testified that of the 10 or 12 fruit trees he had planted none survived. The oak trees had become "sparse" because of dying limbs which had to be picked up every time the yard was mowed. He testified that the property was devalued because the trees are "continually dying."

Ed Dickey of the Dickey Tree Service testified that he had inspected the Roberts's trees. He found 107 oak trees, all of which had been damaged, and 12 of which had died. He said the damage would be progressive, and in his opinion, in the second year after the spraying larger branches would begin to die toward the tips of the branches. In the third year entire limbs would die, and in the fourth year some trees would die with only the strongest surviving.

Mr. Watkins testified that he was present when his rice land was being sprayed by Worthington. He saw the chemical drift onto the Roberts property, and he recalled covering the tomato plants and the gusts of wind. He also testified that some of the

Roberts's trees were already damaged, and that he had used STAM many times and had never seen it destroy mature oak trees.

Appellant Robert Worthington testified that he had been applying STAM to rice fields since 1968. It is a "contact" herbicide rather than a hormonal one. It is designed only to kill plants it touches and not get into the root system. It is used to kill grass growing in a rice field. Worthington testified that when he sprayed Watkins's field the wind was blowing three to five miles per hour but he could not argue with someone who said it blew faster. He calculated the wind speed and tried to stop spraying in a manner to prevent drift out of the field he was spraying.

Worthington also testified that he had previously flown over the Roberts property and had seen dead limbs in the trees, and that he saw only a small amount of "burn" on the trees after the spraying. He stated that he had seen trees on which STAM had been sprayed over the years, and no mature trees were killed by the chemical. The ones damaged came back the following year.

Albert Lee Frasure, Jr., an agricultural consultant, testified as an expert for the defense. He had examined the Roberts situation on July 6, 1984, and discovered it was "very evident" that STAM had drifted from the Watkins farm onto the Roberts's property. A number of the trees had evidence of "burn" on the leaves and there was partial defoliation but not as much as three fourths defoliation.

## 1. New trial

The jury, responding to an interrogatory, determined there had been no negligence. The Robertses moved for a new trial, and the court granted the motion, stating that "the defendants' verdict in favor of defendant, Robert Worthington, is clearly contrary to the preponderance of the evidence and, therefore, should be set aside."

Prior to the adoption of the Arkansas Rules of Civil Procedure in 1979, the grounds for granting a new trial were found in Ark. Stat. Ann. § 27-1901 (Repl. 1962). The grounds found in Rule 59(a) were taken verbatim from the statute with one exception. In 1982 the word "clearly" was added so that the ground now found at Rule 59(a)(6) states that a new trial may be

granted by the trial court if "the verdict or decision is clearly contrary to the preponderance of the evidence or is contrary to the law."

The change in the rule came in conjunction with our decision in *Clayton* v. *Wagnon*, 276 Ark. 124, 633 S.W.2d 19 (1982), where we explained:

> The trial court is vested with discretion in acting on such a motion because the trial judge's opportunities for passing upon the weight of the evidence are superior to those of this Court. On appeal, the trial court will not be reversed absent an abuse of discretion. Abuse of discretion in granting a new trial means a discretion improvidently exercised, i.e., exercised thoughtlessly and without due consideration. *Freeman* v. *Morrilton Water Co.*, 274 Ark. 419, 625 S.W.2d 492 (1981).

In view of the consistency of the testimony in this case to the effect that the wind was blowing at the time the spraying occurred and that at least some injury was caused to the trees and other vegetation on the Roberts property, we cannot hold that the trial court abused his discretion in granting a new trial. Even the expert testifying for the defense observed that the STAM had drifted onto the Roberts land and had caused some injury there. The appendix contains no testimony about precautions taken by Worthington to keep the STAM off the Roberts's trees other than his attempt to calculate how far the STAM would drift. Although Worthington testified about the mechanism used in the plane to keep the STAM from dripping from the spraying booms after it was shut off, that had nothing to do with the drift caused by spraying on a windy day but was a mechanism used to see to it that when the plane flew over land other than that to be sprayed no STAM would be released.

The evidence seems to us to be strong that there was negligence which was the proximate cause of a loss suffered by the Robertses. While there was some evidence on the other side, including Watkins's statement that he saw no need to call off the spraying due to the wind and some evidence that STAM could not cause the kind of damage reported by the majority of the witnesses, we cannot fault the trial court for finding that the preponderance was clearly in favor of the Robertses. The very

wording of Rule 59(a)(6) contemplates that there will be some evidence on both sides of the issue. Otherwise the rule would permit granting a new trial only when all of the evidence, rather than a clear preponderance of it, favored the moving party.

Worthington has argued that by granting the motion the trial court, in effect, took the case from the jury and found there was negligence as a matter of law. That is not the case. As we pointed out in *Turrise* v. *Crane*, 303 Ark. 576, 798 S.W.2d 684 (1990), "showing of abuse is more difficult when a new trial has been granted [as opposed to refused] because the party opposing the motion will have another opportunity to prevail." A new trial is hardly the equivalent of a directed verdict.

## 2. Damages

While it is not necessary to the decision of this case, we review the court's instruction on damages for the purpose of guidance upon retrial. The court instructed the jury on damages as follows:

> If any interrogatory requires you to assess the damage to the property of the plaintiffs, you must then fix the amount of money which will reasonably and fairly compensate them for the following element of damage if proximately caused by the negligence of Robert Worthington. . . .
>
> The difference is the fair market value of the land and its improvements before and after the occurrence. In determining the amount of damage you may consider replacement value, cost of future treatment, aesthetic value, or benefit of shade trees or ornamental trees in assessing such damage.

Worthington argues that the instruction was improper because it does not limit the possible damages solely to "The difference in the fair market value of the land [and its improvements] immediately before and immediately after the occurrence" which is the language of AMI 2222.

The instruction given was apparently a combination of AMI 2222 and language based upon the damages award in *Bowman* v. *McFarland*, 1 Ark. App. 235, 615 S.W.2d 383 (1981). In the *Bowman* case, the court of appeals dealt with intentional destruc-

tion of trees in violation of a contractual duty and held that "the cost of replacement" value rule permissible in contract cases was appropriate.

 The instruction contained elements of both "cost of replacement" rule and the "difference in value of the land" rule. To allow both would, of course, result in double recovery. While cost of treatment or replacement could possibly be of some help in guiding the jury to determine the difference in the value of the land immediately before and immediately after the occurrence, *Floyd* v. *Richardson*, 211 Ark. 177, 199 S.W.2d 754 (1947), we regard the combination of rules in the instruction given here as presenting a danger of double recovery. If the court intended to limit damages to the difference in the value of the land before and after the injury, it should have given AMI 2222 without alteration.

While AMI 2222 states the only rule of damages we have approved in cases such as this, by our approval of the model instruction as well as by our opinion in *Cy Carney Appliance Co., Inc.* v. *True*, 226 Ark. 962, 295 S.W.2d 768 (1956), we do not regard the law as limiting recovery solely to the measure stated there. Modern cases recognize that the use to which an owner puts land may sometimes be considered. In some instances, for example, tortious destruction of trees resulting in the clearing of land might increase its *market* value but decrease the value of the land for the *use* made of it by its owner. *See, e.g.*, *Milozar* v. *Gonzales*, 619 S.W.2d 283 (Tex. App. 1981). Where the market value of the land remains the same or is increased by the allegedly tortious conduct, an instruction to the jury to award as damages the difference between the before and after market value of the land (decrease) would result in no recovery by the owner. That would be unfair to a landowner who has suffered a loss with respect to the use being made of the land.

The cost of restoration of land is recognized as a measure of damages in Restatement of Torts 2d, § 929.(1)(a) (1977). The following appears in comment b. to that subsection:

> . . .when a garden has been maintained in a city in connection with a dwelling house, the owner is entitled to recover the expense of putting the garden in its original condition even though the market value of the premises has

not been decreased by the defendant's invasion.

Professor Dobbs discusses the problem, concluding that where ornamental or shade trees are injured, the use made of the land should be considered, and the owner compensated by the damages representing the cost of replacement of the trees. "The landowner is entitled to keep his land in whatever condition he likes, short of a nuisance, and this interest is protected only if the owner is sufficiently compensated so that he can restore it." D. Dobbs, *Remedies*, p. 316 (1974). He cites *Samson Construction Co.* v. *Brusowankin*, 218 Md. 458, 147 A.2d 430 (1958), in which a plaintiff was allowed to recover for replacement of destroyed trees with ones as large as practical. Where, as in this case, many of the trees have not been destroyed but may have been injured to the extent they require treatment to help restore them to their former condition, we see no reason why reasonable cost of treatment might not be recoverable as alternative to cost of replacement.

Whether AMI 2222 or an instruction on cost of restoration is to be given will depend on the evidence. The evidence here justified the giving of an instruction allowing reasonable replacement cost of the destroyed trees or other reasonable cost of restoring the property, as nearly as possible, to its condition prior to the alleged tortious act.

Affirmed.