STATE of Arkansas *v.* DIAMOND LAKES OIL COMPANY

01–760 66 S.W.3d 613

Supreme Court of Arkansas
Opinion delivered February 14, 2002

*Mark Pryor*, Att'y Gen., by: *Charles L. Moulton*, Ass't Att'y Gen., for appellant.

*Friday, Eldredge & Clark*, by: *Diane S. Mackey* and *Kelly M. McQueen*, for appellee.

Tom Glaze, Justice. This case involves the cleanup of an environmentally contaminated gas-station site, and it requires us to interpret our statutes regarding when a period of limitations commences. Jurisdiction is in this court pursuant to Ark. Sup. Ct. R. 1-2(b)(6).

The gas station at issue here is a Citgo facility, located at 498 East Page Street, in Malvern. As early as 1991, neighbors had complained of gasoline odors coming from the vicinity of the East Page Citgo. The Arkansas Department of Environmental Quality ("ADEQ") conducted soil and water tests that showed some contamination; for unknown reasons, however, ADEQ took no further action with respect to this contamination and required no remediation at that time. In May of 1992, Ronnie Waggoner, the president of Diamond Lakes Oil Co., purchased the Citgo station; at the time, he was aware of the 1991 ADEQ investigation. In 1994,

ADEQ received another complaint about gasoline smells around the area, and it ordered another assessment of the property. The East Page Citgo again passed the tank and line tightness tests, and ADEQ informed Waggoner that the station was in compliance; according to Waggoner, that was the last he heard from ADEQ until 1997.

In 1997, Sabrina Fleming, a homeowner whose property adjoined the Citgo property, filed a complaint with ADEQ, alleging that there was gasoline leaking onto her land. ADEQ undertook another investigation of the Citgo property, and at that time, discovered significant groundwater and soil contamination under the station. At that time, ADEQ ordered Waggoner to undertake interim corrective action under Ark. Code Ann. § 8-7-809 (Repl. 2000), which is part of the Regulated Substance Storage Tank Act. ADEQ directed Waggoner to address the contamination by taking actions such as removing the tanks, soils, lines, pumps, pump islands, and canopies. Waggoner and his company were eligible for reimbursement of costs, minus a deductible, from the Arkansas Petroleum Storage Tank Trust Fund ("the Fund"), see Ark. Code Ann. § 8-7-901 et seq. (Repl. 2000) (reimbursement costs at the time of trial were $116,000). Subsequent sampling revealed that the source of the contamination was from another gas station, the Malvern Chief, located across the street. Upon further investigation, it was discovered that underground "slugs" of contamination were migrating from the Malvern Chief's property.

On July 15, 1998, Fleming sued Diamond Lakes, alleging that gasoline contamination from the Citgo property migrated onto her property, causing her damages. On August 18, 1998, Diamond Lakes filed an answer to Fleming's complaint and a third-party complaint against the Malvern Chief, alleging that the Chief station's leak resulted in gas leaking onto the Citgo property. ADEQ filed a motion to intervene in this lawsuit pursuant to Ark. Code Ann. § 8-7-908(d)(2) (Repl. 2000), in order to protect its interests payable from the Fund.

During discovery, ADEQ learned that Diamond Lakes was seeking $472,184.95 in temporary damages, which represented the costs to clean the Citgo property, despite Diamond Lakes' eligibility for reimbursement under the Fund. On August 10, 1998, ADEQ filed a motion for summary judgment, alleging that Diamond Lakes had brought its suit outside of the three-year statute of limitations, see Ark. Code Ann. § 16-56-105(4), and that a damage award predicated on cleanup costs was impermissible because the Fund was already reimbursing Diamond Lakes for those costs. On August

31, 2000, Diamond Lakes responded, alleging ADEQ's motion was flawed for the following reasons: 1) Diamond Lakes' action was not a complete cause of action before 1997; 2) the gasoline contamination was a recurring event, and therefore tolled the statute of limitations; and 3) the collateral-source rule prohibited the admissibility of evidence of the Fund's reimbursement of the cleanup costs to Diamond Lakes.

On September 18, 2000, ADEQ filed a motion *in limine* to exclude Diamond Lakes' request for remediation because ADEQ was in the process of assessing the Citgo property, and Diamond Lakes could not obtain these damages because Diamond Lakes had failed to exhaust its administrative remedies. Diamond Lakes rejoined that the exhaustion-of-remedies doctrine was not applicable, and filed its own motion *in limine*, seeking to exclude any evidence of the value of the property; Diamond Lakes argued that because it was only seeking temporary damages and only intended to introduce evidence of cleanup costs, the value of its Citgo property was irrelevant. ADEQ responded that the Citgo property had been appraised at $52,400 and that the cleanup costs were not a proper measure of property damages because the costs grossly exceeded the market value of the property.

On October 11, 2000, the trial court held a hearing on the parties' motions, and, by letter order dated October 26, 2000, made the following rulings: 1) the three-year statute of limitations was applicable, but there was a fact question concerning the timing of the occurrence or reoccurrence of the event giving rise to the cause of action; 2) ADEQ's exhaustion of remedies argument was denied; and 3) Diamond Lakes' request to exclude the value of the Citgo property was granted.

After a trial, commencing on October 31 and ending on November 2, 2000, the jury found in Diamond Lakes' favor, awarding it temporary (remedial) damages of $200,000 and consequential property damages in the sum of $100,000. ADEQ filed a motion for judgment notwithstanding the verdict,[1] reasserting its arguments that the statute of limitations had barred the complaint, and that the award of temporary damages was improper because they were grossly disproportionate to the value of the property. The

---

[1] The State also moved for a directed verdict at the close of Diamond Lakes' case, and the trial court denied that motion as well.

trial court denied the motion, and from the jury award and the final order denying the motion for JNOV, ADEQ brings this appeal.

In its first argument for reversal, ADEQ restates its contention that Diamond Lakes' action was barred by the three-year statute of limitations found in Ark. Code Ann. § 16-56-105(4) (1987). That statute provides that "[a]ll actions for trespass on lands" shall be brought within three years after the cause of action accrues. Particularly, ADEQ argues that Waggoner knew about the existence of the contamination at least as early as 1994, but did not file his third-party complaint until 1998; in other words, ADEQ urges, the statute of limitations commenced in 1994 and barred Diamond Lakes' cause of action sometime in 1997.

The limitation period found in § 16-56-105 begins to run when there is a complete and present cause of action, and, in the absence of concealment of the wrong, when the injury occurs, not when it is discovered. *Chalmers v. Toyota Motor Sales, USA, Inc.*, 326 Ark. 895, 935 S.W.2d 285 (1996); *Shelter Ins. Co. v. Arnold*, 57 Ark. App. 8, 940 S.W.2d 505 (1997) (statute of limitations for tort actions begins to run when the underlying tort is complete). Further, if there is any reasonable doubt as to the application of the statute of limitations, this court will resolve the question in favor of the complaint standing and against the challenge. *Dunlap v. McCarty*, 284 Ark. 5, 678 S.W.2d 361 (1984).

When the running of the statute of limitations is raised as a defense, the defendant has the burden of affirmatively pleading this defense. *Chalmers*, 326 Ark. at 902. However, once it is clear from the face of the complaint that the action is barred by the applicable limitations period, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the statute of limitations was in fact tolled. *Id.* This court has held that fraud or deliberate concealment suspend the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence. *Id.* In discussing when a negligent act occurs to begin the three-year statute of limitations, this court has previously noted that "[a]t times, the beginning of the occurrence is a law question to be determined by the court. At other times, it is a fact question for the jury to determine." *Id.* (quoting *Orsini v. Larry Moyer Trucking, Inc.*, 310 Ark. 179, 833 S.W.2d 366 (1992)).

ADEQ argues that Arkansas follows the "occurrence rule" to determine when the statute of limitations begins to run, and cites *Ragar v. Brown*, 332 Ark. 214, 964 S.W.2d 372 (1998), in support of its contentions.[2] Further, ADEQ posits that, in trespass cases, absent fraud or deliberate concealment, the cause of action arises at the time of occurrence. Because Diamond Lakes never alleged fraud or deliberate concealment on the part of the Malvern Chief in its pleadings, ADEQ contends, the statute of limitations should have expired sometime in 1997 because Waggoner "knew, or should have known, about the trespass to his property" in 1994.

■ Diamond Lakes rejoins this argument by noting that the trespass in this case was "inherently concealed," and because of the nature of the trespass, the cause of action should not have accrued until Waggoner could ascertain the full nature and extent of the injury.[3] This so-called "discovery rule" has been previously recognized by this court on many occasions. For example, in *Martin v. Arthur*, 339 Ark. 149, 3 S.W.3d 684 (1999), the court stated that when an injury is suffered, no cause of action in tort begins to accrue *until the plaintiff knows, or by the exercise of reasonable diligence should have discovered, the cause of the injury* (emphasis added); *see also McEntire v. Malloy*, 288 Ark. 582, 707 S.W.2d 773 (1986) ("[a] cause of action will not accrue under the discovery rule until the plaintiff discovers or in the exercise of reasonable diligence should have discovered *not only that he has been injured but also that his injury may have been caused by the defendant's conduct*") (quoting *Raymond v. Eli Lilly & Co.*, 371 A.2d 170 (N.H. 1977) (emphasis added).

■ We find application of the discovery rule to be appropriate in light of the facts presented in this case, as even ADEQ frames its argument in terms of when Diamond Lakes "knew or should have known" of the contamination. Here, the evidence demonstrated that Diamond Lakes could not have known about the cause of the contamination until 1997. Although, as ADEQ points out, Diamond Lakes' expert, Dr. Jerry Overton, stated that the contamination had been present since at least 1994, he also testified that there

---

[2] The "occurrence rule" provides that an action accrues when the last element essential to the cause of action occurs, unless the wrongdoing is actively concealed. *See Ragar*, 332 Ark. at 219, where this court acknowledged it had held fast to this minority rule in cases involving attorneys and other professionals, including accountants and insurance agents.

[3] Diamond Lakes also argues that this court should apply the limitations period found in 42 U.S.C. § 9601 *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act, or "CERCLA." However, Diamond Lakes did not raise this argument below until its response to ADEQ's second motion for judgment notwithstanding the verdict; therefore, it is untimely, and we do not discuss it further.

was not enough information to identify the source of the pollution in 1994. He further related that information about the source was not available until 1997, when additional monitoring wells were installed at both the Citgo and the Malvern Chief properties. While the presence of contamination was known to Waggoner as early as 1994 (if not 1992, when he purchased the station), at that time, he did not know that there was anything that needed to be done to clean the site up, since ADEQ did not direct any kind of remediation until 1997. Further, in addition to not knowing the scope of the injury, Waggoner and Diamond Lakes did not know — and, according to Overton, could not have known — the *cause of the injury* until 1997. Specifically, until Waggoner learned that Diamond Lakes' injury was caused by the migration of gasoline from the Malvern Chief, his cause of action had not accrued, and did not accrue until 1997.

For its second point on appeal, ADEQ argues that the trial court erred in granting Diamond Lakes' motion *in limine* to exclude evidence of the market value of its Citgo property. At trial, ADEQ had sought to introduce evidence that the fair market value of the gas-station property was $52,400. In its motion *in limine*, Diamond Lakes had contended that, because ADEQ had ordered remediation, the property would eventually be cleaned up, and therefore the only damages it was seeking were temporary damages. The court reasoned that, because Diamond Lakes was not seeking permanent damages, the market value was irrelevant.

 The trial court's decision was correct. Arkansas Model Instruction 2224 provides that temporary or repairable damages to real property are measured by "[t]he reasonable expense of necessary repairs to any property which was damaged." Where the damages are capable of repair, restoration costs are a recoverable element of damages for temporary damage done to property, *Kutait v. O'Roark*, 305 Ark. 538, 809 S.W.2d 371 (1991), and when injury to real property is temporary, the measure of damages is the cost of restoring the property to the same condition that it was in prior to the injury. *Fox v. Nally*, 34 Ark. App. 94, 805 S.W.2d 661 (1991) (citing *C.R.T., Inc. v. Brown*, 269 Ark. 114, 602 S.W.2d 409 (1980); *Arkansas Western Gas Co. v. Foster*, 254 Ark. 14, 491 S.W.2d 380 (1973)). In *Fox*, the court of appeals correctly held that the trial court did not err in excluding evidence of the before-and-after value of the land, because the damage was temporary in nature, and such evidence was not the proper measure of damages. *See also Shamlin v. Shuffield*, 302 Ark. 164, 767 S.W.2d 687 (1990). Here, because ADEQ mandated that the Citgo site be cleaned up, the

damages were by their very nature temporary, as they would cease to exist once the environmental remediation was completed. ADEQ's evidence about the fair market value of the property was irrelevant to what it would cost to restore the property to its former condition.

■ ADEQ's third argument on appeal also pertains to the trial court's rulings with respect to the damages awarded to Diamond Lakes. It asserts that the temporary damage award of $200,000 was grossly disproportionate to the actual value of the Citgo station ($52,400), and that where damages to real property are capable of repair, then the injured party may recover only the reasonable expense of necessary repairs. If the damages are permanent or incapable of repair, the proper measure of damages is the difference in market value before and after the injury, or diminution in value. However, quoting from *Benton Gravel Co. v. Wright*, 206 Ark. 930, 175 S.W.2d 208 (1943), ADEQ argues that where there is more than one method of estimating damages and either of two measures will fully compensate the injured party for his loss, that measure which is less expensive to the wrongdoer must be adopted.

■ This argument again ignores the fact that it was ADEQ that ordered the remediation; Diamond Lakes had no discretion in the process.[4] Dr. Overton, Diamond Lakes' expert, testified that the reasonable cost of remediation, as directed by the State, was in excess of $260,000; other unreimbursed expenses exceeded $60,500. Of the former amount, ADEQ had only reimbursed $116,000 from the Petroleum Storage Tank Trust Fund. *See* Ark. Code Ann. § 8-7-905(d) (Repl. 2000). The jury awarded $200,000 in temporary damages. This amount was not unreasonable,[5] because Diamond Lakes had no choice but to conduct the repairs.

In its final point, ADEQ argues that the damages sought and ultimately awarded by the jury were speculative and contingent, because those damages depended on what the State would require in the future. ADEQ points to testimony by Dr. Overton to the effect that ADEQ had not yet decided whether or not the building

---

[4] Oversight of the assessment process was required to be provided by a registered professional geologist or professional engineer, and all work plans had to be approved by ADEQ in order for the Petroleum Fund to provide reimbursement. The owner of the Malvern Chief testified that, with respect to the state-ordered remediation, he had "to do what the State says or we're shut down or we're fined I think $10,000 a day. . . . We have no discretion one way or the other of what to do and how to do it."

[5] $260,000 + $60,500 = $320,500 − $116,000 = $204,500.

would have to be torn down, and that Mike Shinn, the ADEQ project manager, would have to approve any efforts made toward the cleanup. Because such requests by ADEQ for further assessment and corrective action had not been made by the time of trial, ADEQ asserts, any award of damages was based on speculation as to what ADEQ would require in the future.

However, the costs to repair or replace the property were definite and based on bids and estimates Diamond Lakes' owner, Waggoner, had obtained. Ron Burns, one of Diamond Lakes' expert witnesses, testified that it would take $88,000 to put the fuel system back in operation; that system had been removed at ADEQ's direction. Dr. Overton testified, as noted above, that the environmental remediation costs alone would exceed $260,000. Other witnesses testified as to the costs necessary to get the gas station back up and running. The damage award, then, was not based on speculation, but was instead based on testimony presenting amounts either already spent on repairs, or estimates, gathered from appropriate persons, showing what future costs would be required.

■■ Moreover, this court has held that recovery will not be denied merely because the damages are difficult to ascertain. *See, e.g., Morton v. Park View Apartments*, 315 Ark. 400, 868 S.W.2d 448 (1993); *Dr. Pepper Bottling Co. v. Frantz*, 311 Ark. 136, 842 S.W.2d 37 (1992) (holding that this court has not insisted on exactness of proof in determining damages, and if it is reasonably certain that some loss has occurred, it is enough that damages can be stated only approximately). Here, the damages were based on actual expert-calculated figures and on expenditures already made. Therefore, the trial court did not err in denying ADEQ's motion for judgment notwithstanding the verdict on the question of damages.

For the foregoing reasons, we affirm.