FELTON OIL COMPANY, L.L.C., and the State of Arkansas *v.* Horace and Louise GEE

03-747 182 S.W.3d 72

Supreme Court of Arkansas
Opinion delivered May 20, 2004

*Ian W. Vickery*, for appellant Felton Oil Company, L.L.C.

*Mike Beebe*, Att'y Gen., by: *Charles L. Moulton*, Senior Ass't Att'y Gen., for appellant State of Arkansas.

*McMath Woods P.A.*, by: *Samuel E. Ledbetter*, for appellees.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Derrick W. Smith* and *Walter G. Wright, Jr.*, for *amicus curiae* Arkansas Oil Marketers Association.

R OBERT L. BROWN, Justice. Appellants Felton Oil Co., LLC, and the State of Arkansas appeal from the circuit court's judgment and order awarding the appellees, Horace and

Louise Gee, temporary property damages in the amount of $180,000 and discomfort, disruption, and inconvenience damages in the amount of $25,000. The damages stemmed from the migration of petroleum products onto the Gees' property from Felton Oil's property via a leak in certain piping from an underground storage tank through a diesel pump. The State of Arkansas intervened in the matter to protect its interest in the Arkansas Petroleum Storage Tank Trust Fund. We affirm the judgment.

Liability was conceded by Felton Oil. The only issue for the jury to decide was the amount of damages. The facts, as are pertinent, were presented to the *venire* by the circuit court:

> [T]his case is Horace and Louise Gee versus Felton Oil Company, State of Arkansas is an Intervenor. This case involves pollution to property. The Plaintiffs, Horace and Louise Gee live next door to the Conoco convenience store that is located on the southwest corner of Highways 167 and 278 in Hampton, Arkansas. Mr. and Mrs. Gees' property faces Highway 278, which the old Highway 4 and is adjacent to the Conoco store. The Defendant, Felton Oil Company, owns the Conoco store. Felton Oil stores gasoline and diesel fuel in an underground storage tank system at the Conoco station. A leak, primarily consisting of diesel fuel, has occurred from this underground storage tank and migrated onto the Gees' property. The Gees are claiming damages to their property in the form of the cost of cleaning up this pollution beyond what has already been done.
>
> The Attorney General of Arkansas has intervened in this case in order to protect the interests of the Petroleum Storage Tank Trust Fund, which acts as a fund to pay claims for property damages resulting from releases from underground storage tank systems and for costs of cleanup for restoration.
>
> The Gees claim that while the Defendant has performed certain measures designed to restore their property and remove the contamination, additional restoration work is needed. The Gees may claim other damages. Felton Oil has admitted liability in this case and the sole issue for you to determine is what, if any, damages the Gees have suffered.

### I. Felton Oil

Felton Oil argues, as its sole point, that the circuit court erred in instructing the jury on damages for discomfort, disruption, and inconvenience, which resulted in the award of $25,000. It

contends that it operated a gas station, which had a lawful use and purpose and was not a nuisance *per se*. It further asserts that while there was an accident on its property which caused the Gees damage, Felton Oil did not use or occupy its property so as to cause the Gees any nuisance, annoyance, or disturbance. Felton Oil argues, in addition, that the recovery for temporary damages for nuisance should be lost rental value which fairly compensates a landowner for the loss of the full use and enjoyment of their property and not separate damages for discomfort, disruption, and inconvenience.

We begin by responding to the Gees' argument that this point is not preserved for our review. According to the Gees, Felton Oil did not move for a directed verdict at the close of all the evidence, which is required under Arkansas Rule of Civil Procedure 50(e) to preserve for our review any question relating to sufficiency of the evidence.

Here, however, the record reflects that while Felton Oil did not renew its motion for directed verdict at the close of all the evidence and thus did not preserve a sufficiency-of-the-evidence issue, it did object to the instruction that permitted damages based on inconvenience and annoyance. Felton Oil further objected on the basis that there was insufficient evidence to allow an instruction on nuisance and, as a consequence, any damages derived from nuisance. The objection was made prior to the time that the court instructed the jury on the law and dealt with both the instruction itself and the evidentiary basis to support the instruction. We conclude that the objection to the instruction was sufficient to preserve the issue of disruption damages for our review. *See* Ark. R. Civ. P. 51. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Griffin Constr. Co.*, 338 Ark. 289, 993 S.W.2d 485 (1999).

Turning to the merits, the instruction at issue provided:

> Defendant Felton Oil Company has admitted liability in this case. It is for you to determine the amount of money which will reasonably and fairly compensate the Plaintiffs for any of the following elements of damage sustained, which you find were proximately caused by the fault of Defendant Felton Oil Company.

> First, the reasonable expense of any necessary repairs to any property that was damaged;

> Second, any discomfort, disruption, or inconvenience during any necessary repair to any damaged property.

Whether either of these elements of damage has been proved by the evidence, and the extent of such damage, is for you to determine.

The Gees maintain that this instruction was permissible for the case at hand because of *Restatement (Second) of Torts* § 929 (1979), and that the damages awarded for injury to their property need not have anything to do with the law of nuisance but only with harm to their land.

■ Section 929 of the *Restatement (Second) of Torts* reads:

(1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for

(a) the difference between the value of the land before the harm and the value after the harm, *or at his election* in an appropriate case, the cost of restoration that has been or may be reasonably incurred,

(b) the loss of use of the land, and

(c) discomfort and annoyance to him as an occupant.

(2) If a thing attached to the land but severable from it is damaged, he may at his election recover the loss in value to the thing instead of the damage to the land as a whole.

*Restatement (Second) of Torts* § 929 (1979) (emphasis added). Thus, under the terms of this section, the landowner may elect restoration costs as the measure of damages for harm to land. One comment to the Restatement regarding subsection (1)(c), reads:

*e. Discomfort and other bodily and mental harms.* Discomfort and annoyance to an occupant of the land and to the members of the household are *distinct grounds* of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm to his proprietary interests. . . .

*Restatement (Second) of Torts* § 929, comment *e* (1979) (emphasis added).

This court has previously cited to § 929 of the *Restatement (Second) of Torts. See Worthington v. Roberts*, 304 Ark. 551, 803 S.W.2d 906 (1991). In *Worthington*, which concerned damage to

the landowner's ornamental trees, we said with respect to the instruction given by the trial court:

> Whether AMI 2222 or an instruction on cost of restoration is to be given will depend on the evidence. The evidence here justified the giving of an instruction allowing reasonable replacement cost of the destroyed trees or other reasonable cost of restoring the property, as nearly as possible, to its condition prior to the alleged tortious act.

304 Ark. at 558, 903 S.W.2d at 910. While not instructive on the precise issue presented in the instant case, the *Worthington* case does demonstrate that this court has approved an instruction fashioned in part on § 929 in the past.

A review of the Gees' complaints reveals that in their allegation of negligence, they asserted that they had suffered damages, which included

> (c) Loss of use and enjoyment, fear and fright, loss of peace of mind and impact to plaintiffs' quiet use and enjoyment of their property; [and]

> (d) Disruption and inconvenience to quality of life[.]

We conclude that both of these assertions fall within the ambit of damages contemplated by subsection (1)(c) of § 929.

While Felton Oil claims that the court instructed the jury on nuisance, we disagree. Though the circuit court did refer to the instruction "based on nuisance damages," in a later comment, the court clarified its position on the matter:

> THE COURT: All right. Now, the Court did not give [sic] use and enjoyment instruction, I struck that from the instruction, I just allowed the instruction on discomfort, disruption and inconvenience during the period that repairs were being, the property was being restored.

A review of the jury instruction actually given by the circuit court reveals that the court modified AMI Civ. 2222. The Note on Use for that instruction provides that the model instruction cannot be used as written and must be completed by selecting the appropriate elements of damage from among AMI 2223 through 2229. In the case at hand, the circuit court selected AMI Civ. 2224 as the first element of damage, which provides the

reasonable expense of necessary repairs to any property that was damaged. The court then created its own instruction for the second element based on § 929. This was not error. This court has held that AMI instructions are to be used as a rule and that non-AMI instructions should only be used "when an AMI instruction cannot be modified." *Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 586, 66 S.W.3d 568, 581 (2002). Here, we hold that AMI 2222 was appropriately modified.

In support of the disruption damages, Mrs. Gee testified that knowing that diesel fuel had leaked onto her property "turned [her] world upside down and . . . made [her] nervous, upset, irritable. . . . It's just really put [her] life on hold." She further testified that she thinks about it every day. She said that during the cleanup by the Arkansas Department of Environmental Quality, "[w]hile they were working there was very much noise" and that it had invaded her privacy. She also stated that she had seen her doctor because she "was depressed over what [she] was going through with on [her] property[.]" Based on the foregoing, we believe there was sufficient reason to warrant the giving of the jury instruction at issue. *See e.g., Hopper v. Garner*, 328 Ark. 516, 944 S.W.2d 540 (1997). The jury could readily have determined based on this testimony that there would be additional disruption and annoyance due to the additional work. Accordingly, the circuit court did not abuse its discretion by giving the instruction on disruption damages.

## II. The State

The State similarly argues that the circuit court erred in deviating from the language of AMI 2222 and 2224 by instructing the jury to determine reasonable and fair damages, if it found that Felton Oil proximately caused the Gees "any discomfort, disruption, or inconvenience during any necessary repairs to any damaged property." It also asserts that the circuit court was not clear about its rationale for modifying AMI 2222's and 2224's language and that a fair reading of the court's instruction allowed for the potential for *future* disruption and inconvenience damages during the additional cleanup activities. The State further contends that the circuit court erred by "blending" two property damage theories — nuisance and temporary property damage, which had the effect of allowing a double recovery arising out of the same action.

Finally, the State claims that Arkansas, like other states, does not recognize the tort of negligent infliction of emotional distress, absent physical injury. Thus, it urges that because the Gees did not sustain any physical harm from the leakage of diesel fuel onto their property, the circuit court erred in instructing the jury on distress and annoyance. It further contends that it is not precluded from appellate review of this issue where it is not challenging the sufficiency of the evidence but instead is urging as a matter of law that the Gees cannot recover added damages for distress and annoyance absent any physical injury. The State claims that the matter is preserved for our review since it was raised, first, to the circuit court before the trial started and then in a directed-verdict motion at the close of the Gees' case and at the conclusion of its own case-in-chief before the final instructions were read to the jury.

■ For the reasons already stated with regard to Felton Oil's argument on the same point, we affirm. It was not an abuse of discretion to give a modified AMI 2222 instruction premised on disruption and annoyance under § 929, even without direct physical injury caused by the harm to the property.[1] In addition, there was ample testimony presented by the Gees regarding the disruption and annoyance they had experienced during the ADEQ's initial work. The jury obviously concluded that the Gees would suffer similarly from any additional cleanup. We hold that this is a reasonable basis for awarding the $25,000 in disruption damages, and we affirm.

### III. Temporary Damages

The State next claims that a fact issue that was never resolved existed in this matter. It contends that the testimony presented demonstrated that residual contamination would continue on the Gees' property after remediation and that because the property could never be completely restored, the injury to the land was permanent — not temporary. In addition, the State claims that the fair market value of the Gees' property was $31,500 and the property's diminution in value caused by the leak was $20,500. Because of this evidence, the State urges that the jury should have resolved whether the damage to the Gees' property occasioned by

---

[1] There was evidence that fuel vapors would permeate the house as a result of the fuel leakage, but this point was not developed as a physical injury.

the fuel migration was temporary or permanent. It further asserts that the circuit court misinterpreted this court's decision in *State v. Diamond Lakes Oil Co.*, 347 Ark. 618, 66 S.W.3d 613 (2002). In sum, the State maintains that the Gees suffered a total destruction of the value of their property and that their property damages should have been limited to the diminution in fair market value occasioned by the migrating fuel. It further points out that the Gees are under no legal requirement to spend any of their $180,000 damage award on the actual restoration of their land. Thus, it claims that the potential for the Gees receiving a windfall looms large.

In *Kutait v. O'Roark*, 305 Ark. 538, 809 S.W.2d 371 (1991), this court observed that where the damaged property is capable of repair, restoration costs are a recoverable element of damages for the temporary damage done to property. This court has further said that when injury to land is temporary, the measure of damages is the cost of restoring the property to the same condition that it was in prior to the injury. *See State v. Diamond Lakes Oil Co., supra.*

In *Diamond Lakes*, the State contended that the circuit court erred in granting Diamond Lakes' motion in limine to exclude any evidence of the property's market value. The circuit court had reasoned that because Diamond Lakes was not seeking permanent damages, the market value was irrelevant. In affirming the circuit court's decision, we held that by virtue of the fact that the Arkansas Department of Environmental Quality (ADEQ) ordered the cleanup of the property at issue, the damages by their very nature were temporary, "as they would cease to exist once the environmental remediation was completed." 347 Ark. at 626, 66 S.W.3d at 617. *See also Highland Indus. Park, Inc. v. BEI Defense Sys. Co.*, 192 F. Supp. 2d 942, 945 (W.D. Ark. 2002) (observing that "Arkansas decisions are much more clear in their development of the concept that designation of damage as temporary hinges upon the potential for repair or restoration"), *rev'd on other grounds*, 357 F.3d 794 (8th Cir. 2003) (reversing the award of summary judgment and damages, because claims on which they were based were barred as untimely).

We disagree that an unresolved fact question exists in this case. Just as in *Diamond Lakes*, ADEQ in the case before us ordered a cleanup of the Gees' property. While it did not order the Gees to restore the property to its former state, that is of no great

moment. In *Diamond Lakes*, the State's own agency, ADEQ, believed that the property could be remediated. Thus, we concluded that the damages at issue were temporary in nature. The federal district court observed in the *Highland Indus. Park* case that this court in *Bush v. Taylor*, 130 Ark. 522, 197 S.W. 1172 (1917), suggested that the "definition of temporary hinges on the possibility of restoration so that 'the property destroyed could be replaced in substantially the condition in which it existed before.'" *Highland Indus. Park, Inc.*, 192 F. Supp. 2d at 946 (quoting 130 Ark. at 531, 197 S.W. at 1174). That appears to be precisely the position of ADEQ in the instant case, as it ordered corrective action to be taken. We conclude that the circuit court did not err in instructing the jury on restoration costs for temporary damages for the purpose of putting the Gees' property back in substantially the same state it was in before the accident.

With respect to whether the temporary damages should have been limited to the diminution in the fair market value of the property, which was $20,500, we hold that the damages should not have been so circumscribed by the court. In *Diamond Lakes*, the State asserted a similar argument, which was that the temporary damage award of $200,000 was grossly disproportionate to the fair market value of the property. However, we concluded that because ADEQ had ordered the remediation and Diamond Lakes had no discretion in the remediation work, the amount of damages was not unreasonable, since Diamond Lakes had no choice but to make the repairs even if they did exceed the diminution in fair market value. *See also Nischke v. Farmers & Merchants Bank & Trust*, 187 Wis. 2d 96, 522 N.W.2d 542 (1994) (holding that because Nischke has a legal duty to restore the environment, she could recover the cost of repair even though such costs exceeded the diminishment in her property's value).

Here, the additional remediation work which was at issue in the Gees' litigation was not mandated by the State and appears to have dealt mainly with the Gees' groundwater. Indeed, the State contested the necessity for it. Nevertheless, the Gees proved their case to the jury that additional restoration work was necessary. We see no real distinction between ADEQ directing remediation, as was the case in *Diamond Lakes*, and a jury's verdict that additional restoration was needed, as happened in the instant case. In both situations, the conclusion was that the property could be remediated, and under our holding in *Diamond Lakes*, this means the property damage was temporary.

This court has previously observed that "if either of two measures will fully compensate the injured party for his loss, that measure which is least expensive to the wrongdoer must be adopted[.]" *Benton Gravel Co. v. Wright*, 206 Ark. 930, 934, 175 S.W.2d 208, 210 (1943). This court made that statement in the context of determining that the question of whether the injuries sustained to the property were permanent or temporary in that case was better left to the jury.[2] And yet it is clear that the landowner's personal use of the property has also been a factor in awarding temporary damages. Section 929 of the *Restatement (Second) of Torts* has this comment on restoration:

> . . . If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm. . . .

> On the other hand, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building.

*Restatement (Second) of Torts* § 929 (1979). Howard Brill, in his treatise, commented on personal use in the same vein:

> . . . If either of the measures will fully compensate the owner, some case law suggests that the measure that is more definite and certain and less expensive to the wrongdoer must be adopted. However recent authority indicates that the appropriate measure of damages requires consideration of the use to which the owner put or intended to put the land. To the extent that the owner had a personal use for the land and a bona fide desire to repair or restore the land to its pre-injury condition, the court is more likely to view the injury as temporary in nature and award replacement or resto-

---

[2] In that case, the court determined that where reasonable persons could honestly differ as to whether the damages sustained were temporary or permanent in nature, that question should be presented to the jury. Here, the evidence, as well as this court's decision in *Diamond Lakes*, demonstrates that because ADEQ and the Gees' experts believed the property was capable of being restored, the damages were clearly temporary in nature, which negated the need to send such a determination to the jury.

ration costs. . . . However, an award of restoration costs that would exceed the pre-injury value of the land might be viewed as economic waste and therefore inappropriate.

Howard W. Brill, *Arkansas Law of Damages* § 30-1, at 560 (4th ed. 2002) (endnotes omitted).

■ The Gees' land, which contained their home, clearly had a personal use for them. They lived there and sometimes had family members visit. Moreover, the type of injury involved here, which was a fuel leakage and migration of that fuel, requires remediation under our State's public policy. To be sure, ADEQ had a corrective plan of action, which it was implementing, but when a jury determines that more can be done to offset the damage to the Gees' property, that action should not be discouraged. It appears that the value of the Gees' property prior to the fuel leak was $31,500, while afterward, it was worth $11,000. Under the State's theory, the Gees would be limited to receiving $20,500 in damages, whereas the jury awarded restoration costs of $180,000.[3] We cannot say these damages, which were approximately nine times the diminished fair market value, were "grossly" disproportionate. *See First Elec. Coop. Corp. v. Charette,* 306 Ark. 105, 810 S.W.2d 500 (1991). Because of the property's personal nature and this State's firm policy in favor of remediation and restoration, we cannot say that the circuit court abused its discretion in instructing the jury on restoration costs.

### IV. Administrative Remedy

The State further claims that because the Gees failed to comment on ADEQ's corrective-action plan to remediate their property during the comment period, they failed to exhaust their administrative remedies. Thus, it contends that the circuit court erred in denying its summary-judgment motion on this basis where the evidence indicated that the Gees' claim was based on their dissatisfaction with ADEQ's plan for restoration.

The Gees counter that this point is not preserved for this court's review, because it is an appeal from a denial of summary judgment and this court does not countenance such appeals. We

---

[3] The Gees' expert, Austin Arabie, had opined that $364,298 was a reasonable cost of repair to reduce total permanent hydrocarbons in groundwater to a level of 130 micrograms per cubic liter of water.

disagree under the facts of this case. The State is also appealing from a grant of summary judgment in favor of the Gees which raises this same issue. For that reason, we will address the issue.

 On the merits, this court has held that the rule is well established that a litigant must exhaust his or her administrative remedies before instituting litigation to challenge the action of the administrative agency. *See, e.g., Arkansas Motor Vehicle Comm'n v. Cantrell Marine, Inc.*, 305 Ark. 449, 808 S.W.2d 765 (1991). In the instant case, however, the Gees sought damages against Felton Oil, the owner of the migrating fuel. While the remediation of the Gees' property before the lawsuit was filed was premised on a corrective-action plan established by ADEQ, Felton Oil was responsible for the cleanup. The Gees maintain that Felton Oil should have done more than ADEQ required, but it did not. That was the basis for the Gees' lawsuit for damages.

 This court has held that when a plaintiff prays for relief in litigation that is clearly not available at the administrative level, exhaustion of other available administrative remedies is not required. *See Cummings v. Big Mac Mobile Homes, Inc.*, 335 Ark. 216, 980 S.W.2d 550 (1998). Here, the Gees prayed for damages for the cost of restoring their property beyond what ADEQ had done.[4] Such relief is not available from ADEQ. While there is statutory authority requiring a storage tank owner or operator to immediately collect and remove any release of a regulated substance, *see* Ark. Code Ann. § 8-7-807(a)(1) (Repl. 2000), the same authority limits the owner or operator's obligation to "the existing requirements of any other applicable federal or state statutes or regulations." Ark. Code Ann. § 8-7-807(a)(2) (Repl. 2000). The State fails to point to any statutory authority that requires that the Gees should have first urged ADEQ to amend its corrective-action plan and provide more money for the remediation of their land.

While the State does point to the Mississippi Supreme Court's decision in *Chevron U.S.A. v. Smith*, 844 So. 2d 1145 (Miss. 2002), that case is not apposite. In *Chevron*, the Mississippi Supreme Court overturned a jury verdict of $2,349,275 in favor of the landowners in an oil-field contamination case. On appeal,

---

[4] ADEQ's cleanup standard was to reach the level of 200 part per million total petroleum hydrocarbons in the Gees' soil. The Gees' expert, Austin Arabie, advanced a higher standard for cleanup of the groundwater.

Chevron argued that the judgment should be reversed, because the landowners unreasonably refused to allow the current operator of the field to remediate. In deciding the matter, the court noted that there already existed binding precedent which held that plaintiffs must seek restoration before the Mississippi Oil and Gas Board before a court could properly assess the appropriate measure of damages. *See Donald v. Amoco Prod. Co.*, 735 So. 2d 161 (Miss. 1999). The Mississippi Supreme Court also cited to its case law in which it had previously held that where an administrative agency regulates certain activity, an aggrieved party must first seek relief from the agency before seeking relief in the trial courts. The court then said:

> Because the Smiths refused all offers of cleanup, by-passed the administrative remedy provided by the Oil and Gas Board and filed suit prior to exhausting administrative remedies, this Court must continue to adhere to *Donald.* Accordingly, we reverse the trial court's judgment, and we render the judgment here dismissing the Smiths' complaint and this action without prejudice for failure to exhaust administrative remedies. The Smiths are required to seek clean up relief before the Mississippi Oil and Gas Board.

844 So. 2d at 1149.

In the case before us, the Gees did not "bypass" any administrative remedy. They sought monetary damages for additional cleanup costs over and above the corrective-action plan approved and implemented by ADEQ. The *Chevron* case is not persuasive authority for these circumstances. We cannot say that the circuit court erred in denying the State's motion for summary judgment on this basis.

## V. Groundwater

For its final point, the State argues that groundwater is a state resource, which can be limited by legislative enactments, and that the Gees merely had riparian rights to reasonable use of their groundwater. It contends that the Gees should not have been able to put on a case for damages to restore groundwater they were not using, and for that reason, the circuit court should have granted its motion for partial summary judgment. We conclude, over the Gees' objection, that this issue is preserved for the court's review, because it was raised by the State in defense against the Gees' own

motion for summary judgment. On the merits, we hold that the Gees were entitled to damages for costs associated with remediation of their groundwater.

The Arkansas Groundwater Protection and Management Act is set out at Ark. Code Ann. §§ 15-22-901—15-22-915 (Repl. 2003). Nothing in that act forbids a property owner from seeking damages for contamination to groundwater. It merely grants the Arkansas Soil and Water Conservation Commission power to promulgate rules and procedures for dealing with groundwater rights. *See* Ark. Code Ann. § 15-22-904 (Repl. 2003). The purpose of the act is set forth in Ark. Code Ann. § 15-22-902 (Repl. 2003), which provides: "The State of Arkansas has an abundance of good quality groundwater. . . . In order to protect groundwater for the future, it is necessary to reduce groundwater use. . . ." Groundwater is defined within the act as "water beneath the surface of the ground[.]" Ark. Code Ann. § 15-22-903 (Repl. 2003). The State has failed to cite to any statutory authority establishing the State's ownership of groundwater or any case law which makes such an explicit statement.

 In the instant case, the Gees did not claim contamination to water they were actually using or consuming but rather that petroleum vapors were rising from the groundwater and soil and permeating their home. We hold that the circuit court did not err in permitting the issue of damage to the Gees' groundwater to go to the jury.

Affirmed.

DICKEY, C.J., and THORNTON, J., dissent.

RAY THORNTON, Justice, dissenting. I dissent from the majority's opinion because I believe that without a requirement that the award be spent on remediation of the property, an award of $180,000.00 is disproportionate to the $31,500.00 full market value of the property.

The court's holding in *State v. Diamond Lakes Oil Co.*, 347 Ark. 618, 66 S.W.3d 613 (2002), is good law. When the Arkansas Department of Environmental Quality ("ADEQ") orders a remediation of polluted property, the damage to that property is temporary by virtue of the possibility of remediation. The present case, however, is distinguishable from *Diamond Lakes*, and I believe the majority does a disservice to our prior holding.

*Diamond Lakes, supra,* is premised on a clean-up mandated by the ADEQ. We stated that the damages were temporary because the ADEQ "mandated" the clean-up. Furthermore, it was the fact that Diamond Lakes did not have a choice but to clean-up the polluted site that factored into our holding that the cost of repair was not grossly disproportionate to the value of the property. In *Diamond Lakes, supra,* we said, "The argument [that the damages award is disproportionate to the value of the site] ignores the fact that it was ADEQ that ordered the remediation; Diamond Lakes had no discretion in the process." (footnote omitted). Here, I would hold that, absent a mandate to spend the money on remediation, the damages are not temporary but rather permanent and cannot exceed the fair market value of the damaged property.

The State of Arkansas is the final purse from which the money will flow. The State administers the Arkansas Petroleum Storage Tank Trust Fund. *See* Ark. Code Ann. § 8-7-901 *et seq.* (Supp. 2001). For this reason, I believe it is instructive to look to the intent of the legislature in establishing the trust fund. The fund was created to assist the ADEQ in maintaining the environment and remediating any damage caused by petroleum leaks from underground storage tanks. *See* Ark. Code Ann. § 8-7-905(d). The trust fund will indemnify the cost of remediation as ordered by the ADEQ up to one million dollars for accidental releases. *See* Ark. Code Ann. § 8-7-907. Furthermore, the Trust Fund will indemnify oil companies for damage awards paid to third parties from an accidental discharge. Ark. Code Ann. § 8-7-908.

In this case, though Felton Oil may initially pay the award of $180,000.00 to Horace and Louise Gee, there is no assurance that the Gees will spend any of this windfall on a remediation of environmental damages to their property. No showing of remediation is required to obtain indemnification of Felton Oil by the trust fund.

The plain language of the Arkansas Petroleum Storage Tank Trust Fund Act shows that the legislature intended to protect the environment from accidental petroleum leaks and to create an economically feasible manner for owners of underground storage facilities to offer recourse to third parties. In this case, the trust fund will be paying a large amount of money to private citizens on the grounds that the property needs further remediation. If this award were used to accomplish the goal of environmental remediation, then the temporary nature of the damages could properly support the award as a valid amount per *Diamond Lakes, supra.*

Without any indication that the money will be used for remediation, the damage is permanent and *Diamond Lakes* no longer applies. Permanent injury to property is best remedied by compensation for the diminution in market value.

I find the reasoning of the 8th Circuit Court of Appeals in *BEI Defense Systems v. Highland Industrial Park*, 357 F.3d 794 (8th Cir. 2004) to be persuasive. BEI noted that Arkansas measures damages according to whether the injury to real property is permanent or temporary. I believe that BEI, *supra*, accurately and succinctly describes the law of damages with relation to permanent impairment of property. I also believe that, absent some requirement that the damage award be spent on the remediation, the $180,000.00 in this case is disproportionate and excessive when compared to the market value of the property. The $25,000.00 awarded for discomfort and injury should remain undisturbed as a valid payment of a third-party claim for bodily injury caused by the release. *See* Ark. Code Ann. § 8-7-905(d)(3).

This court has approved a damages award exceeding the value of property when the award is expended for the remediation of the property. Where, however, there is no assurance the award will be spent on the remediation, then any award should be based on the diminution of the value of the property.

For the foregoing reasons, I respectfully dissent.

I am authorized to state that Chief Justice Dickey joins in this dissent.