Craig CAMPBELL, Ben Eoff, and Campbell & Eoff Properties *v.*
James CARTER, Jerre Carter and The Village, Inc.

CA 05-537 219 S.W.3d 665

Court of Appeals of Arkansas
Opinion delivered December 7, 2005

[Rehearing denied January 11, 2006.]

342

*Donald E. Wilson, P.A.*, for appellants.

*Kincaid, Horne & Daniels*, by: *David B. Horne*, for appellees.

R OBERT J. GLADWIN, Judge. Appellants Craig Campbell, Ben Eoff, and Campbell & Eoff Properties were held liable by the trial court, sitting as the finder of fact, for unreasonably interfering with an easement owned by appellees James and Jerre Carter and The Village, Inc. The court awarded appellees a total of $19,722.02, and appellants appealed. We find no error and affirm.

Appellees acquired lots in the Village Estates subdivision in Washington County in the late 1980s and early 1990s. Although it was originally contemplated that the lots would be served by a sewage-disposal plant, the plant was never approved. As a result, the lots were served by septic systems. Appellees' deeds conveyed a septic-system easement over another lot in the subdivision, Lot 45, which was located north across Broadview Drive. The deed of appellees James and Jerre Carter states that they were granted

> an easement for the purpose of operating and maintaining an existing septic tank and sewage and disposal system over and across Lot 45, Block 7, Village Estates Subdivision, Washington County, Arkansas. Said easement shall terminate at such time as a sewage disposal plant for Village Estates Subdivision becomes operational and is approved by the applicable regulatory and licensing agencies.

The deed of The Village contains similar language.

At a certain point, the lots in the subdivision were re-platted, and Lot 45 became Lot 32. There is no dispute that the septic-system easement survived the re-platting, and we will hereafter refer to the servient lot as Lot 32.

Lot 32 remained vacant during the time of appellees' ownership until the summer of 2003, when it was purchased by appellants. In August 2003, appellants began constructing a house and driveway on Lot 32. At one point, appellant Eoff was using a bulldozer to scrape the lot when he was confronted by Mr. Carter, bearing his deed. Mr. Carter explained to Eoff that he had a septic-system easement over the lot, although he could not identify the exact location of the system. According to Eoff, he ceased work immediately and conferred with his business partner, Campbell, about the situation. A week or two later, at Campbell's direction, Eoff dug some trenches in the lot at a depth of twenty-four inches to see if he could discover a septic system. When no system was located, appellants proceeded with the construction of the house.

Eoff said that Mr. Carter contacted him next when the house was about fifty-percent complete. Carter apparently mentioned

getting an injunction to enjoin appellants' construction but never did so. Eoff said that, at that time, Carter still could not identify the location of the septic system. Appellant Campbell also said that he met with Carter at some point when construction was fairly far along. Campbell told Mr. Carter that he did not believe that a septic system existed on the lot but, if it did and appellants damaged it, they would "correct the situation." During this period, construction on Lot 32 did not abate.

Mr. Carter's version of events is somewhat different. He said that, after first confronting Eoff in August 2003, he saw workers back out on the lot a week later. He went over to the lot and learned that appellants had not found a septic system and were going to proceed with laying the foundation of the house. He also said that he saw Eoff later in August and that Eoff told him that they had "looked and couldn't find anything."

In November 2003, after unsuccessfully trying to persuade Campbell and Eoff to cease construction, Carter decided to try and pinpoint the exact location of his septic system. He called Roto-Rooter, who tracked the system from his house northward across Broadview Drive and into a six-inch sewer line that ran adjacent to Broadview. It was discovered that, if the water in the Carters' house was turned on, within a few minutes, water could be seen flowing underneath a manhole cover (above the six-inch line) located in the corner of Lot 32. Carter further learned that the same thing occurred when water was turned on at the house owned by appellee, The Village. However, he could not determine at that time where the water went from the manhole area.

Carter reported his findings to Eoff, but it was Eoff's opinion that the Carters' sewage was flowing along the six-inch line adjacent to Broadview; thus, appellants continued constructing the house. In January 2004, Carter and The Village filed suit against appellants for interfering with their easement. Their complaint sought damages, along with an order requiring appellants to cease construction and remove any existing structures. At that time, the house was seventy to eighty percent complete, but the driveway was not yet poured; appellants continued construction after the suit was filed.

In February 2004, the parties met and decided to dig up parts of Lot 32 for the purpose of trying to locate the septic system. Appellants hired Bud Moore, and he located a "T" coming off of the six-inch line that ran alongside Broadview. The "T" led onto

Lot 32 through a four-inch pipe and then into a septic tank, located in what is now the front yard of appellants' home. Despite this discovery, appellants continued to build. Later, a forty-three-foot lateral line was discovered connected to the septic tank. The line apparently ran out of the tank and underneath the area where appellants planned to construct a driveway. According to Mr. Carter, the next day after the septic system was discovered, appellants started pouring concrete for the driveway. It is undisputed that the driveway now covers part of that lateral line (although the septic tank is not covered).[1]

The case went to trial in October 2004, and the following additional evidence was adduced. David Jorgenson, appellants' predecessor in title on Lot 32, said that, at the time he acquired the lot in the early or mid-1990s, he knew of no easement on it. However, at some point during his ownership, he was informed by the Carters that they had a sewage easement across the lot. Jorgenson went to the Health Department to see if he could find evidence of a septic system on the lot but found nothing. He also dug several test holes on the lot but found no evidence of a septic system. Nevertheless, according to him, when he sold Lot 32 to appellants in the summer of 2003, he informed them of the possibility that a septic system existed on the lot.

Linda Apple was the former owner of the Carters' home. Her deed contained the same grant of an easement over Lot 32. She recalled that, on one occasion in 1986, she had a problem with her septic system, and it "made everything back up." The repairman told her that the problem was with her septic tank, which he determined was on Lot 32. Apple testified that the repairman worked on the tank "deep in the lot," where the back part of appellants' newly constructed house now stands. Her testimony thus indicated that there was a second septic tank on Lot 32 other than the one near appellants' driveway.

Testimony was also given by Rick Johnson of the Arkansas Department of Health. Johnson said that Lot 32 was not big

---

[1] During this same time period, appellants sold the house to Roger and Patricia Penny. The Pennys were informed about the lawsuit, about the sewage easement on the lot, and about the possibility that another resident's septic system could exist on the property. However, appellants agreed to indemnify the Pennys from litigation expenses and any adverse judgment. On June 4, 2004, appellees added the Pennys as defendants in the lawsuit. However, because the Pennys are not participating directly in this appeal, we will, for the sake of simplicity, refer to Lot 32 and the home thereon as belonging to appellants.

enough to support systems for three houses. He stated that, had the Department been aware of the existing septic system on Lot 32 at the time appellants applied for their own septic system, which was now installed on Lot 32, appellants' application would not have been approved. Johnson also noted that appellees' system was in a state of disrepair. Although he observed that the system was currently flowing and that sewage had been pumped out of the 1000-to-1200-gallon septic tank, he anticipated that upgrading and repairs would be needed. He also said that the existing system did not meet Health Department requirements, although it was not malfunctioning to the point that a citation had been issued. Johnson further testified that the lateral line leading away from the septic tank near the driveway was crushed "about halfway through it" and was dry as though no liquid had entered it in a long time. However, despite the need for repairs, Johnson expressed reservations that repairs could be accomplished under the existing circumstances. When asked if, given that appellants' house, driveway, and septic tanks were all on the lot, appellees' tank could be "revitalized or repaired," he said that they could not. Johnson also expressed skepticism that a second tank was located on the lot, although he admitted that one could have been added when another house was added to the system. Finally, he stated that, while he could not say with certainty where appellees' sewage was going, it was possible that "the sewage is either going to another connection off the [six-inch] collector line to another tank, another system, or it's using the collector line as the disposal and going toward Beaver Lake."

Bud Moore, who did the digging on the lot in 2004, explained that he had discovered the "T" where a four-inch pipe on Lot 32 tapped into the six-inch line along Broadview. He testified that, despite the existence of the four-inch pipe leading to the septic tank on Lot 32, he believed that appellees' sewage had been running in the six-inch line and had simply backed up into the septic tank. He further offered his opinion that appellees' system was a "failed" system because the four-inch pipe leading off of the six-inch line was actually intended to flow away from Lot 32, not toward it.

Appellee James Carter testified to his belief that the sewage was going back to another tank, as testified to by Linda Apple. He further said that, if he were to try and repair his system, he "couldn't go anywhere" because appellants' house and driveway were in the way. Finally, he testified regarding damages. He said

that, before the current problems, his house was worth $185,000 but now was worth nothing. He also said that it would cost about $9000 to put a septic system on his own lot. Finally, he offered an exhibit showing that he had paid Roto-Rooter and AAA Septic Tank Service $4062.02 as "expenses incurred re: septic tank dispute," of which The Village reimbursed him for $1650, leaving his net expenses as $2412.02. Likewise, Amy Fugman, Executive Director of The Village, testified that, in addition to the $1650 paid to Mr. Carter, the Village had paid Roto-Rooter $1160. Fugman also said that it would cost The Village $5000 to $6000 to install a new septic system on a different lot.

After the bench trial, the judge determined that appellants' construction unreasonably interfered with appellees' easement and, although he did not order the removal of any structures, he awarded $11,412.02 in damages to the Carters and $8310 to The Village. Appellants now appeal from that order.

█ Cases involving easements are traditionally equity cases, and such cases are reviewed de novo on appeal. *See Wilson v. Johnston*, 66 Ark. App. 193, 990 S.W.2d 554 (1999). However, we will not reverse unless we determine that the trial court's findings of fact were clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the appellate court is left with the firm conviction that a mistake has been committed. *White River Levee Dist. v. Reidhar*, 76 Ark. App. 225, 61 S.W.3d 235 (2001).

██ Appellants argue first that the trial court erred in finding that they unreasonably interfered with appellees' easement. The owner of an easement may recover damages resulting from interference by the servient owner. *See* 28A C.J.S. *Easements* § 209 (1996); 25 AM. JUR. 2D *Easements and Licenses* § 129 (2d ed. 1996). While the owner of a servient tenement may make any use thereof that is consistent with, or not calculated to interfere with, the exercise of the easement granted, *see Howard v. Cramlet*, 56 Ark. App. 171, 939 S.W.2d 858 (1997), he can do nothing tending to diminish the easement's use or make it more inconvenient or create hazardous conditions. *See Hatfield v. Ark. W. Gas Co.*, 5 Ark. App. 26, 632 S.W.2d 238 (1982). The question of the right of a servient owner to obstruct an easement is one of fact to be determined from consideration of the terms of the grant, the parties' intentions as reflected by the circumstances, the nature and situation of the property, the manner in which it has been used and

occupied before and after the grant, and the location of the obstruction. *See Jordan v. Guinn*, 253 Ark. 315, 485 S.W.2d 715 (1972).

■ ■ It is undisputed in this case that appellants constructed a house and driveway that cover at least a portion of appellees' septic system. Moreover, there is testimony by Rick Johnson and James Carter to the effect that appellants' presence on the lot will inhibit appellees' ability to repair and maintain the system. In *Hatfield, supra*, our court addressed a situation in which a building was constructed over a gas-pipeline easement. We noted that, in the case of underground pipelines, "it would appear that one of the primary incidents of the easement is that the line be accessible for maintenance and repair" and that "without such rights the easement could become useless." *Hatfield*, 5 Ark. App. at 30, 632 S.W.2d at 241; *see also Craft v. Ark. La. Gas Co.*, 8 Ark. App. 169, 649 S.W.2d 409 (1983) (holding that construction of a building over a gas line interfered with the use of an easement). The evidence in this case shows that appellants have built over appellees' easement and interfered with appellees' ability to repair and maintain their septic system. Further, appellants did so knowingly, having been warned in advance of their construction that the septic-system easement existed. We therefore agree with the trial court that appellants unreasonably interfered with appellees' easement.

■ Appellants argue, however, that their interference was inconsequential because 1) the lateral line located under the driveway is near a gas line and does not meet with Health Department regulations; 2) the line has been dry and crushed for many years; 3) the system would require a large expansion to meet the needs of the two houses it purportedly serves; 4) the system is currently usable. The gist of appellants' contention seems to be that appellees have not been damaged because their system is functioning and, in any event, should appellees try and make repairs, those repairs would be impossible through no fault of appellants. However, while Rick Johnson testified that the system is currently functioning, he also said that the need for repairs is anticipated and in fact imminent. Further, although Johnson stated that the system did not currently meet Health Department regulations and that there might be some difficulties in making repairs, such as the location of the gas line, he also stated that appellees'

system could not be repaired or revitalized at least in part because of the location of appellants' house, driveway, and septic system. James Carter also testified in this regard. Additionally, appellants' arguments discount the possibility that another septic tank exists on the lot and that the tank is currently located underneath the house itself, as testified to by Linda Apple. In light of these considerations, along with appellants' undisputed prior knowledge that the easement existed, we cannot say that the trial judge erred in ruling as he did.

■ Appellants argue next that the trial judge erred in awarding appellees temporary damages. Where harm is done to real property, damages may be either permanent or temporary. If damages are permanent or incapable of repair, the proper measure is the difference in market value before and after the injury. *State v. Diamond Lakes Oil Co.*, 347 Ark. 618, 66 S.W.3d 613 (2002). On the other hand, temporary or repairable damages are measured by the reasonable expense of necessary repairs to the property. *Id.*; *see also Fox v. Nally*, 34 Ark. App. 94, 805 S.W.2d 661 (1991) (holding that, for temporary injury to real property, the measure of damages is the cost of restoring the property to the same condition that it was in prior to the injury). The easement owner is also entitled to compensation for loss of use of the property. Howard Brill, *Law of Damages* § 30:1 at 529 (5th ed. 2002); *see generally* Arkansas Model Jury Instructions-Civil 2224 (2005). The specific losses are determined on a case-by-case basis. Howard Brill, *Law of Damages, supra.*

■ In the case at bar, there is evidence that appellees will be unable to repair or upgrade their system and that the existence of their system is incompatible with appellants' system. Under these circumstances, we believe that the trial judge devised an equitable solution by compensating appellees for moving their system elsewhere plus awarding them the expenses they incurred as the result of appellants' placing a house on Lot 32. Further, the damages of $11,412.02 and $8310 awarded by the judge correspond with the evidence. Carter testified that it would cost him approximately $9000 to put a new system on his own lot and that he had incurred $2412.02 in expenses, for a total of $11,412.02. Amy Fugman testified that a new system would cost $5000 to $6000 and that The Village had incurred expenses of $2801 ($5500 plus $2810 equals $8310). We therefore find no error in these awards.

 Finally, appellants argue that appellees' claim should be barred by laches. The doctrine of laches is based on a number of equitable principles that are premised on some detrimental change in position made in reliance upon the action or inaction of the other party. *Self v. Self,* 319 Ark. 632, 893 S.W.2d 775 (1995). It is based on the assumption that the party to whom laches is imputed has knowledge of his rights and the opportunity to assert them, that by reason of his delay some adverse party has good reason to believe those rights are worthless or have been abandoned, and that, because of a change of conditions during this delay, it would be unjust to the latter to permit him to assert them. *Id.* Whether a claim is barred by laches depends on the particular circumstances of each case. *See id.* The issue is one of fact, and we will not reverse the trial court's decision on a question of fact unless it is clearly erroneous. *Id.*

 Appellants claim that appellees should have told them the location of the septic system sooner, before the house construction was so far along. This argument is without merit, given that Mr. Carter told appellants of the existence of the easement before any construction had been done on the lot and continued to object to the construction. Appellants took the risk that they were building over a septic system, and, despite clear evidence that an easement existed, they refused to believe that a septic system was present. When they were proven wrong, it was not the fault of appellees but of themselves.

Affirmed.

PITTMAN, C.J., and HART, J., agree.